331 F.3d 1374
 D & N BANK A Federal Savings Bank, in its own right and as successor to Detroit & Northern Savings and Loan Association (now known as Republic Bank), Plaintiff-Appellant,
v.
UNITED STATES, Defendant-Appellee.
 No. 02-5130.
 No. 02-5144.
 United States Court of Appeals, Federal Circuit.
 June 17, 2003.
 
 Howard N. Cayne, Arnold & Porter, of Washington, DC, argued for plaintiff-appellant. With him on the brief were Melvin C. Garbow, David B. Bergman, Edward H. Sisson, and Brian C. Duffy.
 David M. Cohen, Director, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC, argued for defendant-appellee. With him on the brief was Stuart E. Schiffer, Deputy Assistant Attorney General. Of counsel on the brief were Jeanne E. Davidson, Deputy Director; David D. Zimmerman, Gary J. Dernelle, and Elizabeth M. Hosford, Trial Attorneys.
 Before MAYER, Chief Judge, MICHEL, and DYK, Circuit Judges.
 MICHEL, Circuit Judge.
 
 
 1
 Before the United States Court of Federal Claims, D & N Bank ("D & N") sought damages in a breach of contract action that it argued arose from the 1989 enactment of the Financial Institutions Reform, Recovery and Enforcement Act ("FIRREA"), Pub.L. No. 101-73, 103 Stat. 183 (1989). D & N now appeals the decision of the United States Court of Federal Claims granting the government's motion for summary judgment of no contract liability. D & N Bank v. United States, No. 95-539(C) (Fed.Cl.2002) (order memorializing hearing on dispositive motions and resolving merits of count I of complaint). Because D & N has not demonstrated that there was a contract that could have been breached by FIRREA, we affirm.
 
 Background
 
 2
 D & N maintains that the government breached an express or implied-in-fact contract guaranteeing D & N the right to designate as regulatory capital approximately $57 million in goodwill arising from D & N's acquisition of another thrift, First Federal Savings and Loan Association of Flint ("First Federal").[1] D & N also argued that it had a contract-based right to amortize the goodwill over a period of forty years.
 
 
 3
 The trial court concluded that D & N offered no evidence demonstrating it had a contract with the Federal Home Loan Bank Board ("Bank Board" or "FHLBB") and, in fact, that the evidence offered demonstrated the opposite. In its bench ruling, the trial court specifically noted the following evidence supporting its conclusion: (1) neither the plan of merger nor the merger agreement said anything about goodwill, the treatment thereof, or purchase method accounting; (2) the application for merger, which was lengthy and had many attachments, contained no specific reference to a commitment for long-term amortization and gave no hint that assurances were requested against changes in the law or that anything was requested other than approval of the merger under the then-current regulations; (3) the letter from the Bank Board regional director to the Bank Board described the merger proposal as planning to use purchase method accounting but had no mention of goodwill or assurances; (4) the Bank Board resolution approving the merger recited, as the basis for approval, that the merger qualified for approval under applicable provisions of statute, regulation, and Bank Board policy, but included no indication that the Bank Board intended to be assuming the risk of any change in such statutes or other regulations; (5) after the merger, D & N specifically requested forbearances concerning specific net worth items but said nothing about amortization of goodwill, indicating that the plaintiffs knew how to request forbearances specifically; and (6) D & N's common stock offering circular described the merger as accomplished on a voluntary basis without FSLIC assistance. In sum, the trial court concluded,
 
 
 4
 Nothing about the merger transaction suggests that plaintiff was looking for a guarantee, that a change in regulations generally applicable to thrifts would not apply to D & N. And even if such a suggestion could be found, nothing suggests that the Bank Board intended to be assuming the risk that the law might change concerning use of goodwill.
 
 
 5
 On appeal, D & N argues that the parties involved understood that the government committed to "permit D & N to recognize supervisory goodwill and amortize it over forty years" and that the documents and the testimony support its assertion. It also argues that the circumstances involved in its merger were analogous to those in other cases in which this court and the Supreme Court found that the parties had formed a valid contract and were entitled to damages as a result of the passage of FIRREA. Finally, D & N maintains that even if the court were to conclude that there was no express contract, there was an implied-in-fact contract between D & N and the Bank Board.
 
 
 6
 We agree with the trial court that the documents and testimony of the parties involved do not, even when interpreted in a way most favorable to the appellant, show any mutual intent to contract. We thus hold that the trial court correctly granted summary judgment to the government on contract liability. We have jurisdiction under 28 U.S.C. § 1295(a)(3) (2000).
 
 Discussion
 
 7
 We review a grant of summary judgment by the Court of Federal Claims de novo. Winstar Corp. v. United States, 64 F.3d 1531, 1539 (Fed.Cir.1995) (en banc). In the circumstances of this case, whether a contract exists is a mixed question of law and fact. Cienega Gardens v. United States, 194 F.3d 1231, 1239 (Fed. Cir.1998). We review the trial court's conclusions independently and its findings of fact for clear error. Glendale Fed. Bank v. United States, 239 F.3d 1374, 1379 (Fed. Cir.2001).
 
 I.
 
 8
 D & N argues that the totality of the circumstances of its merger and all of the documents and actions when viewed together form a contract.[2] The flaw in this argument is that while it would make a good starting point for D & N's assertion that there was a binding contract, there needs to be something more than a cloud of evidence that could be consistent with a contract to prove a contract and enforceable contract rights. D & N seemingly believes that the quantity of evidence showing interactions between the merging thrifts and between the thrifts and the Bank Board makes up for missing contract elements. Although a contract may arise as a result of the confluence of multiple documents, there must still be a clear indication of intent to contract and the other requirements for concluding that a contract was formed. See Cal. Fed. Bank, FSB v. United States, 245 F.3d 1342, 1347 (Fed.Cir.2001) ("We agree with the Court of Federal Claims that `if the factual records of individual cases show intent to contract with the government for specified treatment of goodwill, and documents such as correspondence, memoranda and [FHLBB] resolutions confirm that intent, the absence of an [assistance agreement] or [supervisory action agreement] should be irrelevant to the finding that a contract existed.'" (quoting Cal. Fed. Bank v. United States, 39 Fed. Cl. 753 (1997))).
 
 
 9
 The elements necessary to determine that a contract exists are the same for both of the appellant's theories for recovery, breach of contract and breach of implied-in-fact contract. One must show (1) mutuality of intent to contract; (2) consideration; and (3) lack of ambiguity in offer and acceptance. Lewis v. United States, 70 F.3d 597, 600 (Fed.Cir.1995). When the United States is a party, a fourth requirement is added: the government representative whose conduct is relied upon must have actual authority to bind the government in contract. Id. We need not reach all four requirements in this case because D & N's proof fails on the first — there is no proof of mutuality of intent to contract.
 
 
 10
 In its brief D & N cites four documents or types of documents as reflecting the existence of a contract: (1) a merger agreement conditioned upon government approval of the purchase method accounting; (2) internal government memoranda; (3) a Bank Board Resolution conditioning approval of the merger on the submission of detailed accounting analyses of the supervisory goodwill resulting from the purchase method of accounting; and (4) the submission of an accountant's letter satisfying the condition of the Bank Board Resolution. However, none of these documents purports to be a contract between D & N and the government or indicates that it binds parties on either side of this transaction. Further, even when the documents are considered in conjunction with one another, the government's intention to be bound is nowhere to be found. No document expresses the government's intention to contract at all, much less contract to permit certain accounting treatment. In fact, any suggestion that the government impliedly had the intent to contract as to the treatment of goodwill because of its approval of the merger is implausible because none of the documents proffered by D & N mentions goodwill or the accounting treatment thereof.
 
 
 11
 When pressed at oral argument, D & N admitted that the only piece of paper that can be viewed as indicating a promise by someone with any authority is the Bank Board Resolution.[3] This document, however, only shows the Bank Board's approval of the merger. Mere approval of the merger does not amount to intent to contract. The Bank Board, in its regulatory capacity, must approve all mergers. See 12 U.S.C. § 1730(q) (1982); see also 12 C.F.R. §§ 546.2(c), 563.22(a) (1982). An agency's performance of its regulatory or sovereign functions does not create contractual obligations. See New Era Constr. v. United States, 890 F.2d 1152, 1155 (Fed. Cir.1989) ("[T]he government's involvement in the financing and supervision of a contract between a public agency and a private contractor does not create a contract between the government and the contractor, for the breach of which the contractor may sue the government."). Something more is necessary. The Bank Board Resolution says nothing about goodwill and there was no negotiation between D & N and the Bank Board that resulted in approval of the merger. D & N and First Federal simply submitted an application for approval of the merger, and the Bank Board accepted it.
 
 
 12
 The testimony of government officials cited by D & N similarly does not show intent to contract; it merely shows that the Bank Board approved of the merger. Again, D & N attempts to make quantity compensate for lack of content. Under the subheading "Government Agents Testified that D & N Contracted with the Government," only a small fraction of the citations to testimony turn out to be testimony by government personnel as opposed to D & N personnel, and even that testimony is not specific to D & N's transaction. For example, D & N cites deposition testimony of Supervisory Agent David L. Hostetler, but Hostetler's testimony is peppered with statements like: "I don't recall the specifics here," "I don't have any specific recollection of any calls," and "I can speak I guess generally about what our procedures were. I don't know if that's important here." The only specific testimony cited by D & N by a government agent is that of Chief Supervisory Agent Gordon J. Husk. Husk testified to his belief that it would have made no sense for D & N to merge without a contract committing the Bank Board to allow D & N to count goodwill as an element of regulatory capital, and his belief that D & N did get such a "commitment." As D & N does not explain the basis for Husk's beliefs or highlight any testimony by Husk about actions or statements by himself or other government agents making any commitments to D & N, it is unclear why Husk's testimony is relevant. The evidence must be construed in the light most favorable to the non-moving party, but all that means here is that we must assume that Husk was telling the truth about his beliefs. There is no automatic error in the trial court's rejecting a witness's testimony about legal conclusions — here whether there was a "commitment" by the government — even on summary judgment.[4] Thus we conclude the trial court did not err in not making any findings about the testimony emphasized by D & N.[5]
 
 
 13
 Similarly, D & N relies on statements by government officials or documents referring to D & N's merger with First Federal as "supervisory" to prove that a contract existed. Specifically, D & N maintains that the characterization of "supervisory" denotes that the merger was "part of the government's program to avoid deposit insurance liability." This argument is perplexing because even if the government did have such a "program" and participation in the program were signaled by labeling a merger "supervisory," alone, it would tell us nothing about the government's intent to contract. Again, performing regulatory duties or setting up a regulatory program is consistent with the regulatory function of an agency and says nothing about the role of the agency as an independent contracting body without further evidence. Because D & N does not offer any additional evidence showing why the characterization "supervisory" is probative of the government's intent to contract, this also does not show error in the trial court's decision.
 
 
 14
 Nor do D & N's arguments that it would have been "irrational" or "mad" for D & N to have acquired First Federal without insuring the right to treat goodwill as regulatory capital permit us to ignore the lack of proof of elements required to show the existence of a contract. Even if D & N would have been instantly insolvent and out of regulatory compliance were it not allowed to treat goodwill as regulatory capital, that fact tells us nothing about the government's intent. It may suggest that D & N had the intent to contract or otherwise reflect the reasonableness of D & N's expectations, but that is all.
 
 II.
 
 15
 The appellant emphasizes the similarities between its merger and the mergers forming the bases of several other decisions in which this court and the Supreme Court held that the plaintiffs were entitled to compensation based on a breach of contract. D & N's merger is very similar to the mergers in those cases, but D & N ignores the fact that it does not matter how similar the mergers are in many lesser respects, the holding in each other case was based on a showing that the thrift involved and the Bank Board had explicitly agreed to be bound. All of the cases in which this court or the Supreme Court concluded that thrifts were entitled to compensation because of the enactment of FIRREA involved independently valid contracts (i.e., the contracts dictated that circumstances such as the passage of FIRREA amounted to breaches of contract and, therefore, entitlements to relief, rather than the circumstances alone giving rise to relief for breach of contract). The cases D & N cites are, thus, all distinguishable from its case on the crucial point that D & N has not proven that the government intended to contract.
 
 
 16
 For example, D & N seeks to align its destiny with that of the Glendale thrift in United States v. Winstar Corp., 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996). However, as D & N itself explains, the Glendale transaction involved a "Supervisory Action Agreement" ("SAA") ratified by the Bank Board. Id. at 861, 116 S.Ct. 2432; see also Winstar, 64 F.3d at 1541. That agreement contained an integration clause that made the Merger Agreement and contemporary resolutions and letters part of the agreement. Winstar, 518 U.S. at 862, 116 S.Ct. 2432. Thus, "the SAA characterize[d] the [Bank] Board's resolutions and letters not as statements of background rules, but as part of the `agreements and understandings' between the parties." Id. at 863, 116 S.Ct. 2432. Here D & N has no such explicit agreement — in an SAA or in any other vehicle — but merely attempts to make much out of the Supreme Court's statements of background rules, ignoring the Court's description of the Glendale transaction itself. D & N seems to argue that because the SAA in the Glendale transaction did not itself refer to goodwill, amortization, or purchase method accounting we should disregard it and deem it to have had no significance to either this court's or the Supreme Court's holdings. This is a misreading of the case law. The SAA itself may not have been the source of all of the terms of the agreement between Glendale and the Bank Board, but it did demonstrate the parties' intent to contract. As the previously quoted excerpt from the Supreme Court's Winstar decision demonstrates, it is the SAA that transforms what would otherwise be background rules, into "agreements and understandings." Id.
 
 
 17
 D & N also compares its circumstances to that of the thrift in California Federal, 245 F.3d 1342. However, in California Federal this court explained that in each of the three transactions between the California Federal Bank ("Cal Fed") and the government there was a "bargained-for exchange." Id. at 1347. The first transaction involved an assistance agreement and the government did not contest the presence of a contract for that transaction. Id. at 1345. The second merger, in which the government contested that there was a contract, included a forbearance letter from the Bank Board stipulating that, inter alia, "the resulting association may amortize any goodwill created over 35 years." Id. The third transaction, which was also contested, involved two forbearance letters confirming "Cal Fed's entitlement to record the merger under the purchase method of accounting and amortize resulting goodwill over 40 years." Id. In other words, in all of the transactions in California Federal there were written documents specifically articulating the government's agreement to certain accounting treatment as the result of bilateral negotiations. That the holdings for the two contested transactions in California Federal were dependent on those explicit documents is clear from the reasoning of the court and, in particular, the explanation that "[t]here is no factual dispute concerning these documents [the forbearance letters], and they are precisely the type of evidence relied upon by the Winstar courts to establish the existence of contracts between acquiring thrifts and the government." Id. at 1348. D & N's attempts to draw parallels between its merger and those of the bank in California Federal are, thus, unmerited as D & N is without similarly explicit documents.
 
 
 18
 Finally, D & N maintains that LaSalle Talman Bank v. United States, 317 F.3d 1363 (Fed.Cir.2003), supports many of the propositions it urges before this court. In LaSalle, however, unlike this case, there were explicit documents demonstrating the government's intention to be bound. It was necessary for the LaSalle court to look at all of the documents and circumstances surrounding the mergers to know the terms of the contract between the government and the thrift in LaSalle, but there was nothing vague about the government's intention to contract. "The basic 1982 commitments of the [government] included a Financing Agreement with the thrifts, and agreements concerning the purchase accounting method of determining liabilities and the accounting treatment of these liabilities as goodwill assets subject to amortization over forty years." Id. at 1369-70 (emphases added). In fact, the government in LaSalle was not even really disputing the existence of contracts — because it was clear from the bilateral documents exchanged that a contract or contracts had been formed — but rather, was arguing that certain subject matter was not covered by the contracts. See id. at 1369 ("The government, challenging the judgment of liability, asserts that there was no breach of contract because some of the undertakings and promises in connection with the 1982 mergers and the 1986 rearrangements were recorded not in executed contracts but in agency documents."). Here, D & N essentially attempts to forgo the initial step for proving a breach of contract claim (namely, proving that a contract existed), skipping directly to a debate of the terms of the supposed contract. It would be an error of law for us to do so, and LaSalle certainly does not provide any support for such a tactic.
 
 Conclusion
 
 19
 In sum, all the evidence in this case shows that the government merely approved D & N's merger and did not enter into an express or implied-in-fact contract relating to the transaction. D & N needed proof of an affirmative statement of the government's intention to be bound either in documents or based on witness testimony about the words and actions of the relevant government officials for both of its contract theories. It failed to do so. On that basis, the trial court's decision is, hereby,
 
 
 20
 
 AFFIRMED.
 
 
 
 
 Notes:
 
 
 [1]
 D & N's other claims — unjust enrichment and taking of property without just compensation or due process — are not at issue in this appeal
 
 
 [2]
 The following is an unofficial transcript of the statements of Mr. Howard N. Cayne (attorney for the appellant) at the April 9, 2003 oral argument before this court:
 I can't identify one specific document [that contains the promise about using supervisory goodwill as regulatory capital on the balance sheet], what I can identify are a totality ...
 * * *
 What creates the agreement in this case is the totality of the arrangements, of understandings, of commitments, of promises going back and forth.
 (repeated words and non-word utterances omitted; punctuation added).
 
 
 [3]
 Another excerpt from the April 9, 2003 oral argument before this court:
 Judge Dyk: The only promise, the only piece of paper that can be viewed as including a promise by someone with any authority is the actual Bank Board Resolution itself, right?
 Mr. Cayne: As far as a piece of paper, that's correct your honor.
 
 
 [4]
 Husk's conclusions, moreover, could also be disregarded on the basis that he admitted his memory of the transaction was not clear. In his deposition Husk was asked: "Do you recall whether you had any discussions about goodwill and regulatory net worth with anyone representing D & N?" and Husk responded: "I couldn't recall that today, no."
 
 
 [5]
 As an independent matter, it is also not clearly erroneous for the trial court to disregard Husk's testimony as irrelevant to the question whether there was a contract between D & N and the government, because "commitment" was not a word used by Husk himself. "Commitment" was, rather, used only by the lawyer questioning Husk and it was used by that lawyer interchangeably with the word "allowing." Thus, Husk's testimony was ambiguous to a degree that made its relevance questionable