Donald K. ANDERSON, Angel Cortina, Jr., and Patricia B. Wallace, Plaintiffs,

and

David Joshua Paul, David L. Paul, and Michael Morgan Paul, Plaintiffs–Appellants,

and

Federal Deposit Insurance Corporation, Plaintiff–Appellant,

v.

UNITED STATES, Defendant–Appellee.

Nos. 03–5009, 03–5030.

United States Court of Appeals, Federal Circuit.

Sept. 25, 2003.

Thomas D. Allen, Wildman, Harrold, Allen & Dixon, of Chicago, IL, argued for plaintiffs-appellants David Joshua Paul, et al. With him on the brief were Thomas M. Lynch, Ariel F. Kernis, and Melissa M. Riahei.

Ellis Merritt, Jr., Attorney, Federal Deposit Insurance Corporation, Legal Division, of Dallas, TX, argued for plaintiff-appellant Federal Deposit Insurance Corporation. On the brief were John V. Thomas, Associate General Counsel; and Jon A. Stewart, Attorney, FDIC, of Washington, DC. Of counsel were Andrew C. Gilbert, John M. Dorsey, III, and Dorothy A. Doherty, Attorney, FDIC, Washington, DC.

Colleen A. Conry, Trial Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC, argued for defendant-appellee. With her on the brief were Stuart E. Schiffer, Deputy Assistant Attorney General; David M. Cohen, Director; Jeanne E. Davidson, Deputy Director; Scott D. Austin, Gregory R. Firehock, and John J. Hoffman, Trial Attorneys. Of counsel was William F. Ryan, Assistant Director.

Before LOURIE, CLEVENGER, and RADER, Circuit Judges.

CLEVENGER, Circuit Judge.

In this *Winstar*-related case, David L. Paul, David Joshua Paul, and Michael Morgan Paul appeal the Court of Federal Claims' grant of summary judgment in favor of the government. *Anderson v. United States*, 47 Fed. Cl. 438 (2000). The Federal Deposit Insurance Corporation also appeals the dismissal for failure to satisfy the case or controversy requirement. *Anderson v. United States*, 47 Fed. Cl. 438, 2000 WL 1222168 (Fed.Cl. Aug.14, 2000). For the reasons discussed in this opinion, we affirm.

## I

### A

The history and circumstances surrounding the thrift crisis of the early 1980s and the resulting enactment of the Financial Institutions Reform, Recovery, and Enforcement Act ("FIRREA"), Pub.L. No. 101–73, 103 Stat. 183 (1989), have been extensively discussed in opinions of the Supreme Court, *see United States v. Winstar Corp.*, 518 U.S. 839, 843–858, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996), and of this court, *see, e.g., Cal. Fed. Bank, F.S.B. v. United States*, 245 F.3d 1342 (Fed.Cir. 2001); *Glendale Fed. Bank, F.S.B. v. United States*, 239 F.3d 1374 (Fed.Cir.2001). We provide a brief summary for the sake of completeness and to set the stage for the decision that follows.

In the late 1970s and early 1980s, soaring interest rates and inflation had a devastating effect on the savings and loan industry. To compete for and attract funds in that financial climate, thrifts had to pay high interest rates for short-term deposits. *Winstar*, 518 U.S. at 845, 116 S.Ct. 2432. However, the cost of these liabilities soon exceeded the thrifts' income from their principal assets, which were

long-term fixed-rate home mortgages created when interest rates were low. *Id.* More than 400 thrifts declared bankruptcy between 1981 and 1983, and many more were on the verge of insolvency. *Id.* The multitude of failed thrifts was threatening to exhaust the insurance fund of the Federal Savings and Loan Insurance Corporation ("FSLIC"), which insured consumer deposits in thrifts. *Id.* at 846–47, 116 S.Ct. 2432.

In response to that crisis, the Federal Home Loan Bank Board (the "Bank Board"), the federal regulatory agency responsible for overseeing federally chartered savings and loans, encouraged healthy thrifts and outside investors to purchase insolvent thrifts in a series of "supervisory mergers." *Id.* at 847, 116 S.Ct. 2432. To induce those mergers and to allow those acquisitions to proceed without the acquiring thrifts immediately becoming insolvent upon completion of the transaction, the Bank Board offered certain financial incentives. *Id.* at 848–50, 116 S.Ct. 2432. The most important incentive was the accounting treatment of "supervisory goodwill," a term for the difference between the market value of the acquired entity's liabilities and assets. *Id.* at 849–50, 116 S.Ct. 2432. This use of supervisory goodwill was attractive to healthy thrifts and outside investors for two main reasons. First, the Bank Board often permitted the acquiring thrifts to count supervisory goodwill toward their reserve capital requirements. *Id.* at 850, 116 S.Ct. 2432. Second and more pertinent to this case, the regulators would in some instances permit the goodwill to be amortized over a long period of time while the thrift could recognize accretion income over a shorter period through purchase accounting, thus allowing the thrift to appear more profitable than it was in fact. *Id.* at 850–53, 116 S.Ct. 2432. Given the advantages of these incentives and the inherent

risks of substantially deviating from Generally Accepted Accounting Principles ("GAAP"), those arrangements were the subject of express agreements between the regulators and the acquiring institutions. *Id.* at 853–56, 116 S.Ct. 2432. Despite such arrangements, the savings and loan industry remained in crisis.

In response, Congress enacted FIRREA in 1989 to prevent the collapse of the industry, to attack the causes of the crisis, and to restore public confidence. *Id.* at 856, 116 S.Ct. 2432. FIRREA abolished the Bank Board and FSLIC, transferred thrift insurance activities to the Federal Deposit Insurance Corporation ("FDIC"), established the Office of Thrift Supervision ("OTS") as the new thrift regulatory agency, created the Resolution Trust Corporation ("RTC") to liquidate or otherwise dispose of certain closed thrifts and their assets, and made substantial changes in the regulation of the savings and loan industry. *Id.* In particular, the statute required thrifts to maintain a set minimum capital requirement and prohibited the use of supervisory goodwill. *Id.* at 857, 116 S.Ct. 2432. Based on that statutory mandate, the OTS promptly promulgated regulations enforcing FIRREA and denying the continued use of supervisory goodwill in the thrifts' accounting procedures. *Id.* The impact of the new statute and regulations was swift and severe. In the wake of FIRREA, many thrifts rapidly fell out of compliance with regulatory capital requirements and were seized by regulators. *Id.* at 857–58, 116 S.Ct. 2432.

These events spawned hundreds of lawsuits in which the acquirers of ailing thrifts sued the United States, alleging, inter alia, that by enacting FIRREA the government breached contracts with the thrifts promising particular regulatory treatment. *Id.* at 858–59, 116 S.Ct. 2432. Eventually, in *Winstar,* the Supreme Court upheld this

court's en banc determination that documents executed by government regulators and the acquiring thrifts in connection with the supervisory mergers at issue constituted enforceable agreements. *Id.* at 859–60, 116 S.Ct. 2432. Since then, we have reviewed a number of other appeals involving the same breach of contract cause of action. *See, e.g., D & N Bank v. United States,* 331 F.3d 1374 (Fed.Cir.2003); *Castle v. United States,* 301 F.3d 1328 (Fed. Cir.2002); *Bluebonnet Sav. Bank, F.S.B. v. United States,* 266 F.3d 1348 (Fed.Cir. 2001). This is another such case.

## B

Dade County Savings and Loan Association ("Dade S & L"), a Florida-chartered and federally insured mutual savings and loan association, was one of the many ailing thrifts in the early 1980s. In 1982, Dade S & L agreed to be acquired by The Westport Company ("Westport"), and consummated the merger by entering into a Reorganization and Purchase Agreement executed on October 1, 1982. *Anderson,* 47 Fed. Cl. at 442. As part of this agreement, Dade S & L converted from a mutual to a capital stock association, and then sold all of its shares to Westport in exchange for an infusion of assets and capital. *Id.* Through this arrangement, Dade S & L fell into the control of David L. Paul, Westport's CEO and majority shareholder, and of a trust set up for the benefit of his sons, David Joshua Paul and Michael M. Paul. *Id.*

Before the reorganization and conversion could proceed, Westport and Dade S & L had to obtain the approval of the Bank Board. Thus, Westport submitted to the Bank Board an Application for Supervisory Conversion, which stated that supervisory conversion was Dade S & L's only available option and requested "certain supervisory forbearances, waivers,

findings and determinations." *Id.* at 443. After the submission of a series of amendments, including the substitution of David L. Paul and Robert Paul (as trustee for the Paul sons) for Westport, *id.* at 443 n. 6, the Pauls and Westport continued to request permission to use the purchase method of accounting to amortize goodwill over a period of 40 years. *Id.* at 443.

The Bank Board staff analyzed the Application over a period of a few months and considered the request to amortize goodwill on a straight-line basis. However, the Bank Board staff recommended against granting the request to amortize goodwill according to non-GAAP procedures, because it "believe[d] that Dade's accounting for GAAP and RAP (regulatory accounting) reporting should be identical except for the amount reported for the equity investment in Westport." Memorandum from Mark Bundle, Regional Director of the Bank Board Office of Examinations and Supervision, to Julie Williams, Director of the Bank Board Security Division of the Office of the Gen. Counsel (Aug. 31, 1983), at 8. The Bank Board staff only recommended one substantive forbearance:

In an August 24, 1983 letter (copy attached) from counsel for Westport and Mr. Paul, a request is made for forbearance, for a five-year period from the FSLIC exercising its authority under Insurance Regulation 563.13(c) with respect to Dade's failure to meet its net worth requirements arising from scheduled items, or losses related to said scheduled items or problem assets. We have no objection to granting this forbearance because we believe these problem assets are attributable to the former managing officer of the association who will not be included in the new management of the institution. *Mr. Paul also requested various other forbearances*

*which we believe should not be granted. Advised of our position, Mr. Paul indicated that such forbearances are not needed for completion of the transaction.*

*Id.* at 2 (emphasis added). By the end of September 1983, the Bank Board General Counsel agreed with the memorandum from the Office of Examination and Supervision ("OES"), and recommended approval of Paul's Application without mentioning the request for non-GAAP goodwill amortization.

Acting on the advice of its staff, the Bank Board adopted Resolution No. 83–549 (the "Resolution") on September 28, 1983, approving Westport's acquisition of the thrift and endorsing Dade S & L's proposed stock conversion. The Resolution further instructed the Bank Board's Secretary "to send to the Association a letter confirming on behalf of the Board certain supervisory forbearances."

As required by the Resolution, the Bank Board's Secretary sent to the Board of Directors of Dade S & L a letter dated September 28, 1983 (the "Forbearance Letter"), that confirmed two forbearances granted by the Bank Board. First, the Bank Board agreed to forbear the exercise of its supervisory authority for a period of five years if Dade S & L failed to meet its net worth requirements as a result of scheduled items or losses related to those scheduled items or problem assets. Second, the regulators also allowed Dade S & L to reduce the thrift's liquidity requirements by any liquidity deficiencies existing on the date of stock conversion and by any aggregate net withdrawals from the thrift's offices after the date of that conversion. There was no mention of any forbearance related to goodwill amortization.

As required by one of the conditions incorporated into the Resolution, West-port's accountant filed the required analysis and opinion, determining that the supervisory goodwill of $525,609,000 would be amortized on a straight-line basis over 25 years. *Anderson,* 47 Fed. Cl. at 444. That opinion was consistent with the OES's analysis that, under GAAP, "a 25–year life on a straight-line basis is an acceptable method for amortizing the goodwill related to the acquisition." Memorandum from Mark Bundle, *supra,* at 8.

Thus, with the Bank Board's approval, Dade S & L converted into a Florida capital stock association, with all of its stock distributed to David L. Paul and Westport as shareholders. *Anderson,* 47 Fed. Cl. at 444. Dade S & L also changed its name to CenTrust Bank, a State Savings Bank ("CenTrust"). *Id.* As a result, David L. Paul became the CEO and Chairman of CenTrust. *Id.*

A few years later, after Congress enacted FIRREA, CenTrust could no longer satisfy its statutory requirements, and the OTS seized control of CenTrust on February 2, 1990. *See id.* The RTC became CenTrust's receiver, and the FDIC succeeded to RTC's responsibilities upon the RTC's statutory expiration pursuant to 12 U.S.C. § 1441a(m).

On May 13, 1992, a federal Grand Jury returned a 100–count superseding indictment against, *inter alios,* David L. Paul based on his operations of CenTrust. *Id.* At trial, a jury found David L. Paul guilty on 68 counts. He also pled guilty to 29 additional counts, including racketeering, conspiracy to defraud the United States government, and multiple counts of making false material entries on the business records of CenTrust. *Id.* In its sentencing decision, the district court presiding over Paul's criminal case fined him $5 million, awarded restitution of $56,058,000 to CenTrust's investors, and awarded $4,022,871 to the FDIC as successor to CenTrust.

While the criminal proceedings against David L. Paul were underway, the Cen-Trust-related civil suit against the United States for breach of contract became ready for adjudication after the Supreme Court issued its decision in *Winstar*, 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964. The FDIC, as successor in interest to the RTC and CenTrust, moved to intervene as plaintiff in the instant suit and filed its complaint by leave of court on March 14, 1997. The parties in this appeal then filed a series of cross summary judgment motions, and the Court of Federal Claims addressed those motions on the papers.

On August 22, 2000, the trial court issued its rulings on the cross summary judgment motions. *Anderson*, 47 Fed. Cl. 438. In rulings relevant to this appeal, the Court of Federal Claims held that there was a contract between David L. Paul, Dade S & L and the Bank Board, through which Paul would acquire and capitalize Dade S & L in exchange for permission to use purchase method accounting and to amortize goodwill over 25 years. *Id.* at 444–46. But the trial court granted the government's summary judgment motion because Paul's criminal plea of fraud required the forfeiture of his contractual claims against the United States pursuant to 28 U.S.C. § 2514. *Id.* at 447–48. In addition, the Court of Federal Claims rejected the claims advanced by David L. Paul's sons, reasoning that although the sons were third-party beneficiaries, their claims were forfeited as a result of their father's fraudulent activities. *Id.* at 446 n. 9.

On August 14, 2002, the Court of Federal Claims granted the government's motion to dismiss all remaining claims, including the FDIC's claims against the United States. Specifically, the trial court determined that there was no case or controversy between the FDIC and the United States in light of this court's decision in *Landmark Land Co. v. United States*, 256 F.3d 1365 (Fed.Cir.2001).

Upon entry of final judgment, David L. Paul, his sons, and the FDIC appealed. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(3).

## II

We review a grant of summary judgment by the Court of Federal Claims de novo, *Gump v. United States*, 86 F.3d 1126, 1127 (Fed.Cir.1996), drawing all factual inferences in favor of the nonmovant, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In the circumstances of this case, whether a contract exists is a mixed question of law and fact. *Cienega Gardens v. United States*, 194 F.3d 1231, 1239 (Fed. Cir.1998). We also review the trial court's legal determinations, such as whether a party has standing, without deference. *See Am. Fed'n of Gov't Employees v. United States*, 258 F.3d 1294, 1298 (Fed.Cir. 2001).

## III

Article III, section 2 of the United States Constitution limits the federal judicial power to the resolution of actual "cases" or "controversies." U.S. Const. art. III, § 2. Thus, for a party to invoke the jurisdiction of a federal court, the party's claim must affect "the legal relations of parties having adverse legal interests." *Aetna Life Ins. v. Haworth*, 300 U.S. 227, 240–41, 57 S.Ct. 461, 81 L.Ed. 617 (1937). In light of our precedent interpreting that constitutional requirement, *see Admiral Fin. Corp. v. United States*, 329 F.3d 1372 (Fed.Cir.2003); *Landmark*, 256 F.3d 1365, we agree with the Court of Federal Claims that the FDIC's presence in this matter represents no more than an intergovernmental dispute which does not rise to the

requisite level of a constitutional case or controversy.[1]

Like the present litigation, *Landmark* was a *Winstar*-related case in which the FDIC intervened as plaintiff by leave of court. In that case, we held that the claims raised by the FDIC failed to satisfy the case or controversy requirement of Article III. As we explained, "in order for a plaintiff's claim to satisfy the case or controversy requirement, resolution of that claim must affect 'the legal relations of parties having adverse legal interests.'" *Landmark*, 256 F.3d at 1380 (quoting *Aetna Life Ins.*, 300 U.S. at 240–41, 57 S.Ct. 461). Applying that rule, we determined that there was no case or controversy, because the FDIC was not adverse to the United States with respect to the claims that it asserted on behalf of the failed thrift. *Id.* Specifically, we determined that "where the FDIC has not asserted claims for recovery in excess of what the failed thrift owes to the government, the case-or-controversy requirement is not satisfied." *Id.* at 1382.

Recently, we expanded the *Landmark* rule in *Admiral*, 329 F.3d 1372. *Landmark* and *Admiral* differed only in the fact that the trial court in *Landmark* had determined the ownership of the respective claims being asserted by Landmark and the FDIC. In *Admiral*, there was no such determination. Nonetheless, we held that:

> Under the holding in *Landmark*, in a case such as the present one, the critical question is whether claims being asserted by the FDIC and claims being asserted by the plaintiff—which the FDIC asserts are derivative claims—total less than the government's priority claim arising from advances made to satisfy deposit liabilities of the failed thrift. If they do, the case-or-controversy requirement is not met and the FDIC lacks standing. It is not necessary to determine the correct ownership of claims being asserted by the plaintiff that the FDIC asserts it owns as successor to the failed thrift.

*Id.* at 1382. Thus, *Admiral* requires that, for the FDIC to have standing, the total amount of the FDIC's claims must exceed the amount the failing thrift, for which the FDIC stands as receiver, owes the United States. Without the existence of such excess liability to nongovernmental parties, the government would essentially take money from one pocket and place it in the next pocket, since its claim has priority over all other creditors, and the FDIC must therefore fully compensate the U.S. Treasury before paying anyone else. *See* 12 U.S.C. § 1821(d)(11) (2000); *Landmark*, 256 F.3d at 1381 (stating that "under the statutory scheme of priority for thrift creditors, the FDIC is obligated to completely satisfy the claim of the government, specifically that of the FSLIC Resolution Fund").

The instant appeal presents the same facts as in *Admiral*, because the Court of Federal Claims did not resolve the ownership of the claims made in this case before dismissing the FDIC. And, as in *Admiral*, none of the FDIC's recovery would ever leave the government's Treasury; the most the FDIC could possibly recover in

---

1. The Court of Federal Claims, though an Article I court, 28 U.S.C. § 171 (2000), applies the same standing requirements enforced by other federal courts created under Article III. *See, e.g., Glass v. United States*, 258 F.3d 1349, 1355–56 (Fed.Cir.2001); *CW Gov't Travel, Inc. v. United States*, 46 Fed. Cl. 554, 557–58 (2000); *see also* 28 U.S.C. § 2519 (2000) (empowering the Court of Federal Claims to enter final judgments in any "claim, suit, or demand against the United States arising out of the matters involved in the case or controversy").

this case was $381.3 million, a sum substantially smaller than the government's priority claim of $2.691 billion. Hence, regardless of whether the FDIC is a necessary party to the case as it insists in its briefs and at oral argument, that agency has failed to satisfy the case or controversy requirement of Article III. *See Fed. Deposit Ins. Corp. v. United States,* 342 F.3d 1313, 2003 WL 22053512, slip. op. at 5–10 (Fed.Cir. Sept. 4, 2003) (dismissing FDIC's suit for failure to satisfy Article III requirement); *Bailey v. United States,* 341 F.3d 1342, 1346, 2003 WL 22015442, slip op. at 6 (Fed.Cir. Aug. 27, 2003) (same). Therefore, our precedent compels the affirmance of the trial court's dismissal of the FDIC.

## IV

We also affirm the trial court's judgment against Michael and David Joshua Paul (the "Paul sons"), albeit on other grounds. In its opinion, the Court of Federal Claims ruled that, although the Paul sons were third-party beneficiaries to the contract with the government, "they [could] not sue to enforce the goodwill promise, since the underlying breach of contract actions have been forfeited because of the fraudulent activities of David L. Paul." *Anderson,* 47 Fed. Cl. at 449. We need not reach the merits of that forfeiture determination against the Paul sons, because neither Michael Paul nor David Joshua Paul has standing to sue the government for an alleged breach of contract.

 To have standing to sue the sovereign on a contract claim, a plaintiff must be in privity of contract with the United States. *See Erickson Air Crane Co. v. United States,* 731 F.2d 810, 813 (Fed.Cir. 1984) ("The government consents to be sued only by those with whom it has privity of contract. . . ."). Such privity is lacking in this case. Although a signatory to the contractual documents may bring a direct suit for breach of contract, *see Castle,* 301 F.3d at 1339, neither David Joshua Paul nor Michael Paul actually signed the Application or the amendments submitted to the Bank Board.[2] Rather, Robert Paul, as Trustee of the trust for the benefit of the Paul sons, signed those papers as a substituted party in interest. Thus, although the trust might be, if at all, the direct signatory to the alleged contract, the Paul sons were clearly not signatories of the Application and could not therefore be in direct privity with the sovereign. Yet, the Pauls cite *Far West Federal Bank v. Office of Thrift Supervision–Director,* 119 F.3d 1358, 1364 (9th Cir.1997), for the proposition that unnamed investors could be direct parties to a government contract that they did not sign. That argument, however, distorts the holding in *Far West.* In *Far West,* the Ninth Circuit ruled that the bank's investors had standing to sue, not as direct parties, but as third-party beneficiaries of the contract. *Id.* at 1363–64. Thus, *Far West* does not support a direct-party recovery theory. Consequently, we agree with the trial court that the Paul sons do not have contractual privity with the government.

 We, however, disagree with the Court of Federal Claims that the Paul sons were third-party beneficiaries of the al-

---

**2.** We note that our case law has recognized that a plaintiff may establish privity through an implied-in-fact contract with the United States. *See Maher v. United States,* 314 F.3d 600, 603 n. 1 (Fed.Cir.2002). Even if that option were available in this case, the appellants have not relied on this ground to estab-

lish privity and have thus waived that argument. *See Becton Dickinson & Co. v. C.R. Bard, Inc.,* 922 F.2d 792, 800 (Fed.Cir.1990) (holding that failure to raise issue in opening brief constitutes waiver of appeal of the issue).

leged contract. When it ruled on this matter in 2000, the trial court did not have the benefit of our holdings in *Glass v. United States,* 258 F.3d 1349 (Fed.Cir. 2001), and *Castle,* 301 F.3d 1328. In those two cases which issued in 2001 and 2002, we reiterated the stringent requirements which must be satisfied to establish third-party beneficiary status. As we explained,

> [i]n *Glass,* this court adopted a test more stringent than the one applied in *Far West* [119 F.3d 1358 (9th Cir.1997)]. We held that shareholders seeking status to sue as third-party beneficiaries of an allegedly breached contract must "demonstrate that the contract not only reflects the express or implied intention to benefit the party, but that it reflects an intention to benefit the party *directly.*" *Glass,* 258 F.3d at 1354 (emphasis added). We explained that "specifically, in order to make a shareholder a third party beneficiary, the contract must express the intent of the promissor to benefit the shareholder *personally, independently of his or her status as a shareholder.*" *Id.* at 1353–54 (emphasis added).

*Castle,* 301 F.3d at 1338; *see also Bailey,* 341 F.3d 1342, 1346, 2003 WL 22015442, slip op. at 6 (dismissing shareholder's suit for lack of standing). Under this stricter test, the Paul sons cannot show that they were third-party beneficiaries to the alleged contract with the government. There is, in fact, no evidence in the record indicating that the Bank Board intended to benefit the Paul sons personally. Under the contract, every promise the government allegedly failed to keep in the wake of FIRREA pertains to the regulatory treatment of Dade S & L. Nothing suggests that the government made any promises expressly intended to benefit Michael Paul or David Joshua Paul personally, independently of their status as beneficiaries of the Trust. The Paul sons stood to benefit from the contract solely as the named beneficiaries of the Paul Trust. As such, neither David Joshua Paul nor Michael Paul can meet the test for third-party beneficiary status articulated in *Glass* and *Castle. Accord Fed. Deposit Ins. Corp.,* 342 F.3d 1313, 2003 WL 22053512, slip. op. at 11–13 (holding that thrift shareholders do not have standing to sue the government for breach of contract). Without either direct privity or third-party beneficiary status, the Paul sons lack standing to sue the government and cannot therefore recover damages from the United States.

Consequently, although the trial court erred in determining that David Joshua Paul and Michael Paul were third-party beneficiaries of the alleged contract, that error was harmless since the Court of Federal Claims ultimately held that the Paul sons could not recover any damages from the government. We thus affirm the trial court's ruling against the Paul sons.

## V

There is no dispute that David L. Paul is in privity with the government and that his suit raises a justiciable case or controversy. His suit was properly before the trial court.

In adjudicating David L. Paul's claim on the merits, the Court of Federal Claims concluded that, although the government's enactment of FIRREA breached a promise to allow amortization of goodwill, the plaintiff could not recover against the United States because his criminal convictions barred his claim under the Forfeiture of Fraudulent Claims Act, 28 U.S.C. § 2514 (2000). We agree with the trial court that David L. Paul cannot recover any damages from the government, but we do so based on the plaintiff's failure to show that a contract to permit extended goodwill amortization existed. Conse-

quently, we do not reach the question of whether David L. Paul's claim is barred by the Forfeiture of False Claims Act.

### A

■ To recover against the government for an alleged breach of contract, there must be, in the first place, a binding agreement. To form an agreement ·binding upon the government, four basic requirements must be met: (1) mutuality of intent to contract; (2) lack of ambiguity in offer and acceptance; (3) consideration; and (4) a government representative having actual authority to bind the United States in contract.[3] *Cal. Fed.*, 245 F.3d at 1346; *City of El Centro v. United States*, 922 F.2d 816, 820 (Fed.Cir.1990); *Russell Corp. v. United States*, 210 Ct.Cl. 596, 537 F.2d 474, 481–82 (1976).

■ As a threshold condition for contract formation, there must be an objective manifestation of voluntary, mutual assent. *Restatement (Second) of Contracts* § 18 (1981) [hereinafter *Restatement*].[4] To satisfy its burden to prove such a mutuality of intent, a plaintiff must show, by objective evidence, the existence of an offer and a reciprocal acceptance. *Estate of Bogley v. United States*, 206 Ct.Cl. 695, 514 F.2d 1027, 1032 (1975) ("It is fundamental that in order to have a valid contract one party must make an offer that is a promise which is conditional upon receipt by the offeror of some act or promise from the offeree, and the offer must be accepted as to all its terms by the offeree."); *see also* *Restatement* § 22(1) ("The manifestation of mutual assent to an exchange ordinarily takes the form of an offer or proposal by one party followed by an acceptance by the other party or parties.").

Such an offer is made by "the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." *Restatement* § 24 (1981); *accord* Richard A. Lord, *Williston on Contracts* § 4:13, at 367 (4th ed.1990). In this case, David L. Paul made an offer to the government to acquire Dade S & L in exchange for, inter alia, the. ability to amortize supervisory goodwill over an extended period of time.

As the trial court determined, "[t]he offer was largely memorialized in the Supervisory Application, its subsequent amendments, and letters provided by Dade [S & L]'s and Westport's accountants to the FHLBB." *Anderson*, 47 Fed. Cl. at 445. Indeed, the Application for Supervisory Conversion submitted by Westport requested "certain supervisory forbearances, waivers, findings and determinations" in exchange for the capitalization of Dade S & L and change in management of the thrift. Because "[a]ccounting questions relating to the proposed transactions [we]re presently being researched by an independent accounting firm retained by Westport," the Application noted that such "[r]elevant information will be filed by amendment."

---

**3.** *These general requirements apply equally to express and implied-in-fact contracts. Trauma Serv. Group v. United States, 104 F.3d 1321, 1325 (Fed.Cir.1997).*

**4.** It is well settled by long-standing precedent that the common law of contract governs the creation of a contractual relationship between the United States and a private party. *Winstar*, 518 U.S. at 871–72, 116 S.Ct. 2432 ("In evaluating the relevant documents and cir-

cumstances, we have, of course, followed the Federal Circuit in applying ordinary principles of contract construction and breach that would be applicable to any contract action between private parties."); *Perry v. United States*, 294 U.S. 330, 352, 55 S.Ct. 432, 79 L.Ed. 912 (1935); *Lynch v. United States*, 292 U.S. 571, 579, 54 S.Ct. 840, 78 L.Ed. 1434 (1934).

Subsequently, as part of its second amendment to the Application submitted to the Bank Board in December of 1982, Westport included a letter detailing the proposed accounting treatment for the acquisition of Dade S & L. In that letter, Westport explained that it planned to use the purchase method to account for the acquisition, resulting in the creation of supervisory goodwill which would "be amortized by use of the straight-line method over a period of 40 years in accordance with GAAP." At the same time as Westport proposed to amortize goodwill based on the straight-line method, it would recognize accretion income from Dade S & L's mortgage loan portfolio at a faster rate using a level yield method. As the Supreme Court explained, this "difference between amortization and accretion schedules thus allowed acquiring thrifts [like Westport] to seem more profitable than they in fact were." *Winstar*, 518 U.S. at 853, 116 S.Ct. 2432.

Westport reiterated this proposed accounting treatment in July and August of 1983. In a letter dated July 7, 1983, sent by Westport's accountants to the Bank Board's staff, Westport again stated that the acquisition would result in goodwill, which "should be amortized by use of the straight-line method over a period of 40 years, the maximum permitted under generally accepted accounting principles." To buttress its request for straight-line amortization, Westport further listed many other supervisory acquisitions in which the Bank Board permitted the amortization of goodwill over 40 years. After a meeting with regulators in late August of 1983, Westport's accountants sent the Bank Board staff another letter dated August 30, 1983, in which Westport modified its request for straight-line amortization. Instead of the 40–year period it previously sought, Westport "determined that the goodwill should be amortized by use of the straight-line method over a period of 25 years." Despite this modification in the requested amortization period, it is clear that, in exchange for acquiring the financially ailing Dade S & L, Westport wanted the Bank Board's promise to allow straight-line amortization of regulatory goodwill over an extended period. In other words, this particular accounting treatment for supervisory amortization of goodwill was a condition of Westport's offer.

Nonetheless, the government contends that there was no clear offer, because Westport did not indicate a preference for one accounting method over another in its initial Application and only requested the purchase accounting method in a subsequent amendment. At bottom, the government's main contention is that the initial Application and the subsequent amendments do not form a single integrated offer which the Bank Board could accept. We have, however, rejected that "single integration" argument in *California Federal Bank*, where we acknowledged that multiple related documents, when read together, could provide evidence of an intent to contract. *Cal. Fed.*, 245 F.3d at 1346–47. As we explained,

> We agree with the Court of Federal Claims that "[i]f the factual records of individual cases show intent to contract with the government for specified treatment of goodwill, and documents such as correspondence, memoranda and [FHLBB] resolutions confirm that intent, the absence of an [assistance agreement] or [supervisory action agreement] should be irrelevant to the finding that a contract existed."

*Id.* at 1347 (quoting *Cal. Fed. Bank v. United States*, 39 Fed. Cl. 753, 773 (1997)) (alterations in original). The government's argument against a clear offer must therefore fail.

In sum, we agree with the Court of Federal Claims that Westport and David L. Paul asked for permission to amortize goodwill on a straight-line basis as a condition of acquiring Dade S & L.

## B

■ For a contract to be formed once an offer is made, there must be an acceptance, i.e., a "manifestation of assent to the terms thereof made by the offeree in a manner invited or required by the offer." *Restatement* § 50(1). In this case, the Court of Federal Claims determined that the government's "acceptance [wa]s memorialized in the Resolution and the Forbearance Letter issued contemporaneously with the Resolution." *Anderson*, 47 Fed. Cl. at 445. We disagree with this determination, because neither the Resolution nor the Forbearance Letter constitutes the necessary "manifest assent," under our precedent,[5] to form a contract for the extended amortization of goodwill.

The Resolution is silent as to the amortization of goodwill, except for one provision. That provision, Condition No. 8, reads:

(8) Within ninety days after the date of this Resolution, or within such additional period as the General Counsel or his designee may for good cause grant, the Association shall furnish *analyses, ac-*

*companied by a concurring opinion from its independent accountants,* satisfactory to the Principal Supervisory Agent of the Federal Home Loan Bank of Atlanta and to the Director of OES which (a) *specifically describe, as of the date of completion of the sale of the conversion stock, any intangible assets, including goodwill,* or discount of assets arising from the transaction to be recorded on the Association's books, and (b) *substantiate the reasonableness of amounts attributed to intangible assets, including goodwill, and the discount of assets and the related amortization periods and methods.*

(emphases added). Condition 8 thus requires that the thrift submit to the regulators detailed accounting analyses and treatment of the supervisory goodwill resulting from the purchase method of accounting. That provision is, however, a regulatory condition rather than a statement of mutual assent. *D & N Bank v. United States*, 331 F.3d 1374, 1378 (Fed. Cir.2003). Like Paul and Westport, the thrift in *D & N Bank* attempted to show mutual intent by relying on, among other documents, "a Bank Board Resolution conditioning approval of the merger on the submission of detailed accounting analyses of the supervisory goodwill resulting from the purchase method of accounting." *Id.*

---

5. To date, at least 21 precedential opinions of this court have adjudicated *Winstar*-related disputes. *See Fed. Deposit Ins. Corp*, 342 F.3d 1313, 2003 WL 22053512; *Bailey*, 341 F.3d 1342, 2003 WL 22015442; *Bluebonnet Sav. Bank, F.S.B. v. United States*, 339 F.3d 1341 (Fed.Cir.2003); *First Commerce Corp. v. United States*, 335 F.3d 1373 (Fed.Cir.2003); *D & N Bank*, 331 F.3d 1374; *Admiral*, 329 F.3d 1372; *Coast Fed. Bank, F.S.B. v. United States*, 323 F.3d 1035 (Fed.Cir.2003) (en banc); *LaSalle Talman Bank, F.S.B. v. United States*, 317 F.3d 1363 (Fed.Cir.2003); *Maher*, 314 F.3d 600; *Castle*, 301 F.3d 1328; *Bluebonnet Sav.*, 266 F.3d 1348; *Landmark*, 256 F.3d 1365; *Glass*, 258 F.3d 1349; *Cal. Fed.*,

245 F.3d 1342; *Glendale*, 239 F.3d 1374; *Caguas Cent. F.S.B. v. United States*, 215 F.3d 1304 (Fed.Cir.2000); *First Hartford Corp. Pension Plan & Trust v. United States*, 194 F.3d 1279 (Fed.Cir.1999); *Shane v. United States*, 161 F.3d 723 (Fed.Cir.1998); *Ariadne Fin. Servs. Pty. v. United States*, 133 F.3d 874 (Fed. Cir.1998); *FDIC v. Maco Bancorp, Inc.*, 125 F.3d 1446 (Fed.Cir.1997); *Wells Fargo Bank, N.A. v. United States*, 88 F.3d 1012 (Fed.Cir. 1996); *Winstar Corp. v. United States*, 64 F.3d 1531 (Fed.Cir.1995) (en banc). Of those 21 cases, only six—*First Commerce, D & N Bank, LaSalle, Maher, California Federal Bank,* and *Winstar*—squarely addressed the formation of a contract. We discuss those cases *infra*.

Considering D & N Bank's evidence individually, we ruled that none of the documents in *D & N Bank,* including the provision at bar, "purports to be a contract between D & N and the government or indicates that it binds parties on either side of this transaction." *Id.* Even after considering that provision in conjunction with internal government memoranda, the merger agreement conditioned upon the government's approval of the purchase method of accounting, or the accountant's submission of the analyses required by the provision, we nonetheless concluded that "the government's intention to be bound is nowhere to be found." *Id.* Instead of misconstruing the provision at bar as a manifestation of assent as the thrift would have us do, we ruled that the resolution and its provision "only shows the Bank Board's approval of the merger." *Id.* In other words, the provision was nothing more than a regulatory requirement imposed by the Bank Board in its regulatory capacity; it was not an acceptance that could create contractual obligations. *Id.* at 1378–79. As we explained, "[s]omething more is necessary." *Id.* at 1379.

That "something more" must be, according to our precedent, a "manifest assent to the same bargain proposed by the offer." *Restatement* § 50 cmt. a. The need for a manifest assent to the offer's terms is clear from the conclusions we reached in the Glendale and Statesman transactions of *Winstar, see Winstar,* 64 F.3d 1531, 1537–42 (Fed.Cir.1995) (en banc), *aff'd* 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996), compared to our ruling in *D & N Bank.* In the Glendale transaction, the acquiring thrift tried to establish the necessary assent by relying on the Bank Board resolution, incorporated into the written supervisory action agreement through an integration clause. In contrast to the *D & N Bank* resolution, the Bank Board resolution in the Glendale

transaction went beyond a mere statement of regulatory approval. The Glendale resolution created contractual obligations by inserting this additional statement mirroring the thrift's offer: "Glendale shall submit a stipulation that any goodwill arising from this transaction shall be determined and amortized in accordance with [Bank Board] Memorandum R–31b." *Id.* at 1540–41. In light of the circumstances surrounding the government's transaction, we deemed the Glendale resolution sufficient to establish the government's intent to contract. *Id.* at 1542. Similarly, in the Statesman contract, the Bank Board's resolution contained the same regulatory provision requiring the submission of detailed accounting analyses, as found in the case at bar. *Id.* at 1543. Were that regulatory provision the sole statement on goodwill, we would not have found a binding contract. However, the Statesman resolution further stated:

> (b) The value of any unidentifiable intangible assets resulting from accounting for the Acquisition and the Mergers in accordance with the purchase method of accounting may be amortized by [Statesman] over a period not in excess of twenty-five (25) years by the straight line method. . . .

*Id.* (ellipsis and bracket in original). This additional language—this "something more"—clearly manifested the government's intention to accept the thrift's offer and to be bound to the terms of the contract. The additional language in the Statesman resolution was not regulatory in nature; it was contractual.

We adhered to this common law rule of manifest assent in our recent decision in *LaSalle Talman Bank, F.S.B. v. United States,* 317 F.3d 1363 (Fed.Cir.2003). Despite the government's argument to the contrary, we held that there was a contract in that case. *Id.* at 1369–71. Echoing the

Bank Board resolution in the Glendale transaction, *LaSalle's* Bank Board resolution "authorized and anticipated that the surviving thrift would use the procedures of purchase accounting and supervisory goodwill, provided only that Talman submit a stipulation of its intent to do so, as set forth in Bank Board Memorandum R-31b." *Id.* at 1370. As in the Glendale transaction, this additional language, which went beyond the regulatory requirements, provided evidence of the government's promise to permit the extended amortization of supervisory goodwill in exchange for LaSalle's participation in the FSLIC-sponsored Phoenix Program. *Id.* at 1366–67, 1369–70; *see also D & N Bank*, 331 F.3d at 1381 ("In *LaSalle*, however, unlike this case, there were explicit documents demonstrating the government's intention to be bound."). Perhaps, the Court of Claims best captured this requirement for "something more" when it explained that, to create a contract, "[t]he offeree must give in return for the offeror's promise exactly the consideration which the offeror requests and the acceptance must be made absolutely and unqualifiedly." *Estate of Bogley*, 514 F.2d at 1032.

In the case at bar, this "something more"—this statement of manifest assent to be bound—is lacking from the resolution. The only provision discussing goodwill is nothing more than regulatory boilerplate, added by the Bank Board as a regulator rather than as a contractor. Without more, David L. Paul's reliance on those words of the resolution must fail.

To salvage his contractual claim, Paul also points to Condition No. 1 of the Bank Board's resolution. That provision states:

(1) The Association's conversion from a state-chartered mutual association to a state-chartered stock association pursuant to Subpart C of Part 563b of the Insurance Regulations shall be complet-

ed in accordance with the terms of the amended plan of supervisory conversion contained in the Application.

That provision, however, falls short of the language of manifest assent to the terms of a contract, as found in the Glendale, Statesman and LaSalle transactions. Condition No. 1, on its face, evidences no more than the Bank Board's approval of the merger. It is regulatory, rather than contractual, in nature. And regulatory proclamations are insufficient to create contractual obligations because, as we recently held, "[m]ere approval of the merger does not amount to [an] intent to contract." *D & N Bank*, 331 F.3d at 1378. With that clarification now made, it is plain that the resolution in the instant case contains no governmental promise to permit the extended amortization of goodwill.

Similarly, we see no manifest assent in the Forbearance Letter. Indeed, the appellants conceded at oral argument that the Forbearance Letter contains no indication of governmental acceptance of the offer for special amortization treatment of regulatory goodwill. That letter only promised that the regulators would not enforce the net worth requirement for five years or the liquidity requirement for a short time after the supervisory conversion. In other words, neither of the forbearances granted by the Bank Board in this case relates to the amortization of goodwill. If the Bank Board had wanted to permit such depreciation of goodwill, it knew how to do so, as it did in contracting with Winstar. In its transaction with Winstar, the government went beyond the general regulatory language it used in its resolution. *See Winstar*, 64 F.3d at 1544. The Bank Board made a manifest contractual promise to Winstar in its forbearance letter, agreeing to permit extended amortization of goodwill:

For purposes of reporting to the Board, the value of any intangible assets resulting from accounting for the merger in accordance with the purchase method may be amortized by [Winstar] over a period not to exceed 35 years by the straight-line method....

*Id.* (ellipsis and bracket in original). Similarly, the government used almost identical language in the forbearance letter it issued to First Commerce Bank:

3. For purposes of reporting to the Board, the value of any intangible assets resulting from the application of pushdown accounting in accounting for the purchase, may be amortized by Mutual over a period not to exceed 25 years by the straight line method.

*First Commerce Corp. v. United States,* 335 F.3d 1373, 1378 (Fed.Cir.2003). The government did likewise in *California Federal Bank,* when it issued a forbearance letter containing similar contractual language. In *California Federal Bank,* the acquiring institution made a specific written offer by requesting, as a condition of its acquisition of failing thrifts, permission to adopt the "purchase method of accounting using the straight line method over the estimated useful life of" 35 years (or 40 years, for the Family Thrift transaction). *Cal. Fed.,* 245 F.3d at 1345. The Bank Board accepted the offer, with its appurtenant condition, by issuing "a forbearance letter stipulating that the resulting association may amortize any goodwill created over 35 years [or 40 years for the Family Thrift transaction]." *Id.* Because we had "no doubt that both the government and Cal Fed provided consideration for the agreements," we held that there was a binding contract to permit the extended amortization of goodwill. *Id.* at 1347; *see also D & N Bank,* 331 F.3d at 1381 ("[I]n all of the transactions in *California Federal* there were written documents specifically articulating the government's agree-

ment to certain accounting treatment as the result of bilateral negotiations."). Contrary to the Winstar, First Commerce, and California Federal Bank transactions, the Forbearance Letter in the instant case is devoid of similar contractual language related to the amortization of goodwill. We must therefore conclude that the government did not manifestly assent to the goodwill amortization term of Paul's offer.

The undisputed evidence in this case confirms that the Bank Board did not manifest a contractual intent to agree to permit extended amortization of goodwill. After considering Westport and Paul's request to amortize goodwill on a straight-line basis, the Bank Board's Office of Examination and Supervision recommended against granting the request to amortize goodwill according to non-GAAP procedures, because it "believe[d] that Dade's accounting for GAAP and RAP (regulatory accounting) reporting should be identical except for the amount reported for the equity investment in Westport." During the negotiations preceding approval of the Dade S & L acquisition, Paul relented on his demand for permission to amortize goodwill based on a straight-line method. As the staff's memorandum recorded, "Mr. Paul also requested various other forbearances which we believe should not be granted. Advised of our position, Mr. Paul indicated that such forbearances are not needed for completion of the transaction." The undisputed evidence thus indicates that, as a result of his discussion with the Bank Board staff, Paul modified his offer by dropping his request for extended goodwill amortization. Alternatively, the evidence may also support a construction of this situation as a counteroffer resulting from the Bank Board's exclusion of the amortization terms from its acceptance, with the possible ensuing acceptance of the counter-offer by conduct. *See First Commerce,* 335 F.3d at 1381–82. Regardless of the analytical construct, it is

plain that the resulting agreement, if any, did not contain the crucial governmental promise to permit extended amortization of goodwill. There was consequently no binding contractual term that was breached by the enactment of FIRREA, and thus no liability. And without liability, there is no need for us to reach the parties' contention regarding David L. Paul's forfeiture under the Forfeiture of False Claims Act. The summary judgment granted in favor of the government was therefore appropriate.

## VI

In light of the discussion above, we conclude that neither the FDIC nor the Paul sons have standing to sue the government for a breach of contract; their dismissal from the case was correct. Because there is no contract on which David L. Paul may recover against the United States, the trial court properly granted summary judgment in favor of the government. Consequently, the judgment of the Court of Federal Claims is affirmed.

*AFFIRMED.*