**PALFED, INC. and Palmetto Federal Savings Bank of South Carolina, Plaintiffs,**

**v.**

**The UNITED STATES, Defendant.**

**No. 95–496C.**

United States Court of Federal Claims.

July 30, 2004.

---

Mary Catherine Gill, Alston & Bird, Atlanta, Georgia, for plaintiffs.

Edward Sullivan, United States Department of Justice, Washington, D.C., for defendant.

## OPINION AND FINAL JUDGMENT

BRADEN, Judge.

Plaintiffs filed this suit after being notified by counsel that "the appellate courts had rendered some good news for banks suing the Federal government on the Breach of Contract issue relative to the accelerated elimination of Supervisory Goodwill.... although PALFED's treatment of Supervisory Goodwill was basically by implied contract with the government ... it would be wise for the Company to 'throw its hat into the ring' before the statute of limitations on the issue runs in the early August of this year." Def. App. at 722.

In support of their claims, plaintiffs proceeded to file over 3,500 pages of appendix materials in addition to their briefs, all of which the court has examined and cited herein in detail. As the United States Court of Appeals for the Federal Circuit has observed, however, the quantity of evidence is not probative of whether a contractual obligation exists: " '[A] cloud of evidence that could be consistent with a contract' does not satisfy the plaintiff's burden of proving mutual intent." *First Commerce Corp. v. United States*, 335 F.3d 1373, 1380 (Fed.Cir.2003) (quoting *D & N Bank v. United States*, 331 F.3d 1374, 1377 (Fed.Cir.2003)); *see also id.* ("Although a contract may arise as a result of the confluence of multiple documents, there must still be a clear indication of intent to contract and the other requirements for concluding that a contract was formed."). In this case, the court has found that none of the documents nor testimony adduced in deposition comes remotely close to establishing the first contractual element, *i.e.,* mutuality of intent.

## RELEVANT FACTS [1]

### A. Palmetto Federal Savings Bank.

From June 30, 1980 to December 31, 1981, Palmetto Federal Savings Bank of South Carolina ("Palmetto Federal") incurred net operating losses due to "a deterioration in the interest margin between interest revenue on loans and investments, and interest expense on savings accounts and other borrowed money." Def.App. at 205. On November 13, 1981, a Federal Home Loan Bank Board ("FHLBB") examination reported that, although the savings and loan association had a 10 month net loss of $1,254,886 for 1981 to date and a projected net loss for the first six months of 1982, it will have "no difficulty in meeting its net worth and statutory reserve requirements." *Id.* at 136. In addition, the FHLBB noted that although Palmetto Federal's losses had increased in 1982, " 'supervisory concern' was [not] warranted at the time." *Id.* at 287; *see also id.* at 205–06 (notes to Palmetto Federal Consolidated March 19, 1982 Financial Statements reported that although it met minimum net worth requirements as of December 31, 1981, it did not expect to meet existing minimum net worth requirements for the year ending December 31, 1982).

### B. First Federal Savings And Loan Association.

During the 1970s, First Federal Savings and Loan Association of Beaufort, South Carolina ("First Federal") had a history of operating problems caused by poor management. *See* Def.App. at 248.[2] As of June 30, 1981, the notes to First Federal's Consolidated Financial Statements indicated that the institution met its minimum net worth requirements, but "[e]conomic conditions [were] such that uncertainties exist as to the ability of the Association to significantly improve its interest margin, and thereby maintain operations at a level sufficient to meet its minimum net worth requirement at June 30, 1982. [If that occurs,] the FSLIC may take such corrective action as it deems necessary[.]" *Id.* at 78. On August 28, 1981, FHLBB examination of First Federal reported that the institutions "declining level of

1. The facts herein are derived primarily from the Plaintiffs' October 6, 2000 Appendices A–C ("Pl. App."); an October 6, 2000 Affidavit of Darrell Rains, CFO of Palmetto Federal ("Rains Aff."); the Government's October 10, 2000 Appendices ("Def.App."); Plaintiffs' January 11, 2001 Appendix D ("Pl.App."); a January 11, 2001 Supplemental Affidavit of Rains ("Rains Supp. Aff."); and Plaintiffs' February 27, 2003 Appendix E ("Pl.App.").

Other references herein are made to the August 3, 1995 Complaint ("Compl."); Plaintiffs' October 6, 2000 Motion for Partial Summary Judgment on Liability ("Pl.Mot."); the Government's December 13, 2000 Response ("Def.Opp."); Plaintiffs' January 9, 2001 Reply ("Pl.Reply"); the Government's February 8, 2001 Surreply ("Def.Surreply"); the Government's October 10, 2000 Motion for Summary Judgment ("Def.Mot."); Plaintiffs' January 11, 2001 Response ("Pl.Opp."); the Government's January 16, 2001 Reply ("Def.Reply"); and the Government's March 14, 2003 Supplemental Response ("Def.Supp.Resp.").

Further references herein are made to the following depositions and expert reports: Sam Connell, FHLBB Supervisory Agent ("Connell Dep."); Gordon Rowell, Senior Audit Manager, Coopers & Lybrand ("Rowell Dep."); David Rochester, Government Expert ("Rochester Dep."); Robert Cohrs, FHLBB Supervisory Agent ("Cohrs Dep."); Alan Leach, Coopers & Lybrand representative ("Leach Dep."); Am-

brose Schwallie, Palmetto Federal Director ("Schwallie Dep."); Howard Hickey, Palmetto Federal General Counsel ("Hickey Dep."); John Cunningham, Palmetto Federal CEO ("Cunningham Dep."); John Ryan, FHLBB Federal Regulator ("Ryan Dep."); Charles Simons, Palmetto Federal Director ("Simons Dep."); Brent Beesley, FSLIC Director ("Beesley Dep."); Albert Peters, Palmetto Federal CEO ("Peters Dep."); Donald Ropp, Palmetto Federal Director ("Ropp Dep."); Neil Trask, First Federal Director ("Trask Dep."); Linda Logan–Smith, First Federal Treasurer ("Smith Dep."); Franklin Cummings, First Federal Director ("Cummings Dep."); Mark Rundle, FHLBB Regional Director ("Rundle Dep."); Robert Widenhouse, First Federal Officer ("Widenhouse Dep."); Jesse Cummings, First Federal Director ("Cummings Dep."); Larry Johnson, Government Expert ("Johnson Dep."); Expert Report of Larry Johnson ("Johnson Report"); Expert Report of David Rochester ("Rochester Report"); Expert Report of Christopher Barry ("Barry Report").

2. *See also* Pl.App. B (Connell Dep. at 628, 631–32); Pl.App. C (Tab 75 at 2500) (notes from a First Federal director reporting that FHLB–Atlanta rated First Federal as "the biggest supervisory problem in the State of South Carolina."); Pl.App. C (Tab 76 at 2502); Pl.App. C (Tab 78 at 2520); Pl.App. C (Tab 79 at 2522); Pl.App. C (Tab 80 at 2528); Pl.App. C (Tab 84 at 2569); Pl.App. C (Tab 88 at 2577).

profitability" was due to "the high cost of money[.]" *Id.* at 107; *see also id.* at 116 (detailing First Federal's declining net worth).

### C. The Merger Of Palmetto Federal Savings Bank And First Federal Savings And Loan Association.

On December 23, 1981, Palmetto Federal's Board of Directors approved negotiations for a merger with First Federal. *See* Def.App. at 171; Pl.App. C (Tab 67 at 2467). On January 20, 1982, Palmetto Federal and First Federal tentatively agreed to merge. *See* Def.App. at 222. Palmetto Federal elected to use the purchase method of accounting. *See* Pl.App. B (Rowell Dep. at 1524). On March 30, 1982, Palmetto Federal's independent accountants, Coopers & Lybrand, informed Palmetto Federal that the proposed accounting procedures for the merger conformed with GAAP and reported that:

> In our opinion, based on the information furnished to us, the proposed transaction conforms in substance to the requirements for purchase accounting treatment in accordance with Opinion No. 16 of the Accounting Principles Board of the American Institute of Certified Public Accountants; and accordingly, if such accounting treatment is followed, the recording of the proposed transaction will conform with generally accepted accounting principles.
>
> The management of Palmetto had indicated that this criteria will not be met since they intend to dispose of a significant portion of the low-yield assets of First [Federal] after consummation of the merger. Accordingly, APB Opinion No. 16 would require that the combination of First [Federal] and Palmetto be accounted for by the purchase method.

Pl.App. C (Tab 99 at 2644–45).

According to a March 31, 1982 Merger Plan, Palmetto Federal intended to "be more aggressive in its market for savings due to the increased opportunity of placing its deposits in a higher yielding market [First

Federal's strong loan market due to heavy development along the coast] during these periods of extremely high interest rates.... This merger plan has been adopted by both associations and has been made with the sole purpose of building a stronger association capable of meeting the needs of its market area and capable of adapting to the extreme changes in the financial environment being experienced today in the United States.... The sole aim of this merger is to create a synergistic effect so that the resulting association is stronger than the sum of its two parts." Def.App. at 254–55.

On April 2, 1982, First Federal agreed to merge with Palmetto Federal, subject to FHLBB approval. *See* Def.App. at 261, 263; *see also* Pl.App. C (Tab 74 at 2486–93). On May 3, 1982, the FHLBB Applications Department noted that Palmetto Federal, "via voluntary merger," proposed to acquire First Federal "through the purchase of assets method of accounting." Def.App. at 285; Pl. App. C (Tab 36) at 1904; *see also* Pl.App. E (Rochester Dep. at 3432–33). Therefore, the FHLBB recommended that the application be approved subject to the following conditions:

> Within thirty days after the effective date of the merger (*i.e.*, consummation), Palmetto shall furnish current analyses, accompanied by a concurring opinion from its independent accountant, satisfactory to the Supervisory Agent of the Federal Home Loan Bank of Atlanta which (a) specifically describe, as to the effective date of the merger, any intangible assets, including goodwill, or discount of assets arising from the merger to be recorded on Palmetto's books and (b) substantiate the reasonableness of amounts attributed to intangible assets, including goodwill, and the discount of assets and the related amortization periods and methods.

Def.App. at 286.[3]

There is no dispute that the FHLBB was aware that, "Palmetto proposes to utilize the

---

**3.** *See also* Pl.App. C (Tab 36 at 1905); Pl.App. C (Tab 51—May 7, 1982 letter from a FHLBB Supervisory Agent to FHLBB Acting Regional Supervisor in Washington D.C. at 2214) ("Since

the condition contained in the Supervision's recommendation for approval is the *standard condition for mergers involving the purchase of assets method of accounting,* this condition will be in-

purchase method of accounting to acquire First Federal. Our review of the proposal disclosed the following amortization methods and remaining lives: ... Goodwill Straight line—27 years. Palmetto plans to adjust assets and liabilities to fair market value. In accordance with GAAP and APB Opinion No. 16, the association proposes to write off approximately $25,382,000 of goodwill over 27 years." Def.App. 288–89; Pl.App. C (Tab 36 at 1907–08).

Subsequently, Coopers & Lybrand advised the FHLBB that the merger met "the requirements of purchase accounting and will conform to GAAP." Def.App. at 289. Their opinion, however, was qualified since the merger's conformity with GAAP "may not be assumed" if the Technical Bulletin, "Accounting for Business Combinations of Mutual Savings and Loan Associations," was subsequently issued. Def.App. at 289; *see also* Def.App. at 300–01 (Coopers & Lybrand letter stating that the merger did not qualify under the pooling method).

On May 7, 1982, the FHLBB approved the merger concluding that Palmetto Federal would not experience a "significant adverse impact on its own financial condition." Def. App. at 248. The FHLBB's approval, however, was subject to four conditions:

1. That the proposed merger is effected within 120 calendar days of the date of this letter;

2. That, not later than thirty (30) days after the effective date of the proposed merger, [Palmetto Federal] shall submit evidence that it has given notice, in writing, to each investor whose withdrawable account in the surviving association will exceed the sum of $100,000 as a result of the proposed merger, of the effect of the merger on the extent of his insurance coverage ... provided that any accountholder of [Palmetto Federal] whose account exceeds $100,000 solely by reason of the proposed merger is hereby authorized to withdraw the uninsured portion thereof, without penalty;

3. [Palmetto Federal], not later than thirty (30) days from the effective date of the merger, shall submit: (a) a certification by local counsel stating that the merger has been consummated in accordance with the Agreement of Merger, dated April 2, 1982; (b) a statement of the financial condition of each association as of the effective date of the merger; and (c) a letter signed by the chief executive officer of each association stating that, at the time of consummation of the merger, no adverse change has occurred in the condition or operations of said associations, and that the merger has been consummated consistently with the pro forma statement of condition as of December 31, 1981, if any such change has occurred or the merger has not been so consummated, in what respect there has been such a change or inconsistency with said statement of condition;

4. That [Palmetto Federal] furnish analyses accompanied by a concurring opinion from its independent accountant, satisfactory to the Supervisory Agent, which (a) specifically describe, as of the effective date of the merger, any intangible assets, including goodwill, or discount of assets arising from the merger to be recorded on Palmetto Federal's books, and (b) substantiate the reasonableness of amounts attributed to intangible assets, including goodwill, and the discounts and premiums and the related amortization periods and methods.

*Id.* at 245–46.

On June 1, 1982, Palmetto Federal announced that the "merger of two financially strong associations for the purpose of forming an even stronger association to better serve you and other members of both associations. This is a positive move, *strictly voluntary* on the part of both associations, and based solely on sound business reasons." Def.App. at 329 (emphasis added). On June 9, 1982, Palmetto Federal and First Federal signed a Certificate of Merger that the "merger [was] fully and completely effected[.]" Pl.App. C (Tab 104 at 2684–85). On

cluded in our approval letter under delegated authority.") (emphasis added).

August 26, 1982, Palmetto Federal notified the FHLBB that it had complied with conditions 2, 3a, 3b, and 3c of the May 7, 1982 FHLBB approval. *See* Pl.App. C (Tab 101 at 2662–63). On January 4, 1983, Coopers & Lybrand advised Palmetto Federal that its use of the purchase method of accounting was "reasonable and in accordance with [APB] No. 16[.]" Pl.App. C (Tab 104 at 2674). On the same day, Palmetto Federal informed the FHLBB that Coopers & Lybrand had reviewed the purchase method of accounting proposed by the two thrifts, in satisfaction of condition 4 of the FHLBB's approval. *See* Pl.App. C (Tab 102 at 2669–70). On January 17, 1983, the FHLBB informed Palmetto Federal that the application to merger was complete and all the conditions were satisfied with the effective date of merger set for August 2, 1982. *See* Pl.App. C (Tab 103 at 2671); Pl.App. B (Cohrs Dep. at 452).

Thereafter, First Federal's assets and liabilities were recorded on the books of Palmetto Federal at their fair value as of the date of the merger. *See* Rains Aff. (Exhibit B at 14). The fair value of the liabilities assumed by Palmetto Federal, however, exceeded the fair value of the assets acquired by $23,225,000. *Id.* This excess was recorded as supervisory goodwill, an intangible asset, and was to be amortized over a period of 30 years at the rate of approximately $777,000 per year using the straight line method. *Id.* Thereafter, Palmetto Federal began to amortize goodwill as scheduled. *See* Pl.App. D at 3261.[4]

### D. Palmetto Federal Savings Bank's Conversion.

On September 17, 1985, Palmetto Federal's Board of Directors adopted a plan requiring Palmetto Federal to convert from a federal mutual savings and loan association to a federal stock savings bank. *See* Pl.App. C (Tab 114 at 2922).[5] On September 26, 1985, Palmetto Federal filed an application with the FHLBB. *See* Pl.App. C (Tab 110 at 2802). On November 6, 1985, the FHLBB conditionally approved of Palmetto Federal's conversion application. *See* Pl.App. C (Tab 110 at 2802–03); *see also* Pl.App. C (Tab 106 at 2714); Def.App. at 337, 475. On December 31, 1985, Palmetto Federal had a total net worth of $27,239,000, which exceeded required levels of regulatory net worth by approximately $15,429,000. *See* Def.App. at 464.

### E. Formation Of Palfed, Inc.

On March 13, 1986, Palmetto Federal's Board of Directors approved of an Agreement and Plan of Merger creating Palfed, Inc. ("Palfed"), as the parent of Palmetto Federal. *See* Pl.App. C (Tab 106 at 2761); *see also* Def.App. at 522. On May 2, 1986, Coopers & Lybrand informed Palmetto Federal that its amortization of goodwill should be changed to conform with Securities and Exchange Commission Staff Accounting Bulletin ("SAB") No. 42A, which recommended that goodwill be amortized over a maximum of 25 years. *See* Def.App. at 533, 537–38; Pl.App. C (Tab 109 at 2795, 2800). On May 6, 1986, Palmetto Federal's Audit Committee discussed the effects of adopting SAB 42A. *See* Pl.App. C (Tab 108 at 2793–94).

On October 5, 1986, the FHLBB concluded that "[t]he proposed reorganization will provide increased operational flexibility and opportunity for diversification to Palmetto Federal, as well as flexibility in raising new capital and financing business activities[.]" Pl.App. C (Tab 37 at 1915); *see also* Pl.App. C (Tab 114 at 2967–68). On December 22, 1986, the FHLBB approved of the acquisition of Palmetto Federal by Palfed stating: "We

---

4. *See also* Def.App. at 473, 555; Pl.App. C (Tab 106 at 2727, 2732, 2744–46); Pl.App. C (Tab 107 at 2783); Pl.App. C (Tab 114 at 2842–44, 2870, 2909–11, 2915, 3065, 3067); Pl.App. D at 3127; Pl.App. D at 3276, 3303, 3321, 3342, 3363, 3385; Rains Aff. at ¶ 15.

5. *See also* Def.App. at 345 ("Conversion to a capital stock institution will enable [Palmetto Federal] to raise the additional capital needed in order to augment interest sensitive lending programs. . . . Further, the additional capital will help insure that Palmetto Federal will continue to meet regulatory capital requirements[.]"); Pl.App. C (Tab 114 at 2854). Palmetto Federal planned to use the "net proceeds resulting from the sale of Common Stock in the Conversion" to help it meet and exceed minimum net worth and reserve requirements. Def.App. at 359.

have reviewed the information submitted to us in connection with the conditions set forth in the FHLBB Resolution dated December 19, 1986, approving the application of Palfed, Inc. to acquire Palmetto Federal Savings Bank of South Carolina. The applicant has complied with all conditions in a manner satisfactory to this office. We have noted in our records that the effective date of the acquisition was January 27, 1987." Pl.App. C (Tab 38 at 1922); *see also* Def.App. at 542–46.

On January 27, 1987, Palmetto Federal became a wholly-owned subsidiary of Palfed to facilitate the acquisition of mutual and stock savings and loan associations, diversify business activities, provide the flexibility to raise additional capital, increase flexibility under the South Carolina Business Corporation Act, and allow both institutions to file income tax returns on a consolidated basis. *See* Rains Aff. (Exhibit B at 1, 7–8); Pl.App. D at 3127. Palmetto Federal voluntarily decided to conform to SAB 42A requiring that the amortization of goodwill be reduced to a period of 25 years. *See* Def.App. at 197–98; Pl.App. B (Leach Dep. at 765); Rains Aff. at ¶¶ 16–18, Exhibit D at 26.

## F. Effects Of FIRREA.

On August 9, 1989, Financial Institutions Reform, Recovery and Enforcement Act ("FIRREA") was enacted. By 1993, Palmetto Federal failed to meet the risk-based capital requirement, obligating Palfed to make a capital infusion, pursuant to a December 19, 1986 FHLBB Resolution at ¶ 36, requiring Palfed to "cause the net worth of Palmetto to be maintained at a level consistent with that required by Section 563.13(b) of the Rules of Regulations for Insurance Accounts . . . and, as necessary . . . infuse sufficient equity capital . . . to effect compliance with such requirement." Def.App. at 545.[6]

On February 26, 1992, Palmetto Federal notified the Office of Thrift Supervision ("OTS") that the new regulations issued under FIRREA was forcing it to make "potentially detrimental long term business decisions to meet short term capital goals, primarily as a result of the short period of time given to replace capital due to the phaseout of goodwill." Pl.App. C (Tab 113 at 2836); *see also* Pl.App. B (Cunningham Dep. at 817). On January 21, 1993, Palmetto Federal was notified that the OTS was going to take corrective action. *See* Pl.App. B (Schwallie Dep. at 1779). On March 31, 1993, Palmetto Federal and Palfed signed a Supervisory Agreement. *See* Pl.App. B (Ryan Dep. at 1740); Pl.App. B (Simons Dep. at 1826–27). On July 9, 1993, Palmetto Federal notified the OTS that it would fail to meet its risk-based capital requirement on June 30, 1993. *See* Pl.App. C (Tab 40 at 1935); *see also* Pl.App. B (Hickey Dep. at 1020); Pl.App. C (Tab 39 at 1923) (OTS July 20, 1993 letter noting that Palmetto Federal will fail its risk-based capital requirement on June 30, 1993).

On December 24, 1993, Palmetto Federal wrote off the remaining $10.5 million in regulatory goodwill, as required by Financial Accounting Standard No. 72. *See* Pl.App. B (Rains Dep. at 1342, 1346, 1359).[7]

## PROCEDURAL HISTORY

On August 3, 1995, plaintiffs filed this action in the United States Court of Federal Claims. *See* Compl. (Count I—Palmetto Federal's breach of contract claim; Count II—Palmetto Federal's unjust enrichment claim; Count III—Palmetto Federal's promissory estoppel claim; Count IV—Palmetto Federal's Fifth Amendment Just Compensation claim; Count V—Palmetto Federal's Fifth Amendment Due Process claim; Count VI—Palfed's breach of contract claim; and Count VII—Palfed's promissory estoppel claim). The case was assigned to the Honor-

---

6. *See also* Pl.App. B (Hickey Dep. at 1004–05, 1041, 1044) (detailing FIRREA's requirements) and (at 1030, 1042) (raising of capital in 1993); Pl.App. B (Schwallie Dep. at 1796) (Palfed raised about $20 million in a 1993 rights offering); Pl.App. C (Tab 45—Rains October 16, 1991 congressional testimony and prepared statements at 1975, 2022–28); Pl.App. C (Tab 114—Rains Aff.

at 2844) ("Palmetto failed its risk-based capital requirement in 1993.").

7. *See also* Pl.App. B (Leach Dep. at 759–61, 763–64, 767, 769); Pl.App. B (Schwallie Dep. at 1790); Pl.App. C (Tab 114 at 3077).

able Bohdan A. Futey. On August 28, 1996, the case was reassigned to the Honorable Loren A. Smith.

On October 6, 2000, plaintiffs filed a motion for partial summary judgment as to liability supported by three appendices and the affidavit from Mr. Darrell Rains. On December 13, 2000, the Government filed a response. On January 9, 2001, plaintiffs filed a reply. On February 8, 2001, the Government filed a surreply. On October 10, 2000, the Government filed a motion for summary judgment as to Counts I and VI supported by two appendices. On January 11, 2001, plaintiffs filed a response together with an appendix and the supplemental affidavit of Mr. Rains. On January 16, 2001, the Government filed a reply.

On February 1, 2002, the case was reassigned to the Honorable James F. Merow. On July 26, 2002, September 20, 2002, August 23, 2002, October 8, 2002, November 1, 2002, November 18, 2002, January 14, 2003, January 21, 2003, February 11, 2003, February 27, 2003, and March 14, 2003, the parties were allowed to supplement their respective positions. On November 13, 2002, plaintiffs voluntarily dismissed Counts II–V, VII.

On August 15, 2003, the case was reassigned to the undersigned judge. On September 22, 2003, a status conference was held after which the Government submitted a letter on November 18, 2003 and plaintiffs submitted a letter on February 13, 2004 further supplementing their positions.

## DISCUSSION

### A. Jurisdiction.

The United States Court of Federal Claims is authorized, under the Tucker Act, 28 U.S.C. § 1491(a)(1), to render judgment and money damages on any claim against the United States based on the United States Constitution, an Act of Congress, a regulation of an executive department, or an express or implied contract with the United States. *See United States v. Testan,* 424 U.S. 392, 397–98, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976). The United States Supreme Court has clarified that the Tucker Act does not create any substantive right for mone-

tary damages. *See United States v. Mitchell,* 445 U.S. 535, 538, 100 S.Ct. 1349, 63 L.Ed.2d 607 (1980). Instead, a plaintiff must identify and plead an independent contractual relationship, constitutional provision, federal statute, and/or executive agency regulation that provides a substantive right to money damages for the court to have jurisdiction. *See Khan v. United States,* 201 F.3d 1375, 1377 (Fed.Cir.2000).

Palmetto Federal properly has alleged the elements of a breach of contract claim for money damages in Count I. Likewise, Palfed properly has alleged the elements of a breach of contract claim for money damages in Count IV.

### B. Summary Judgment Standard.

If there is no genuine issue as to any material fact, the moving party is entitled to summary judgment as a matter of law. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A material fact is one that might significantly affect the outcome of the suit under applicable law. *See Anderson,* 477 U.S. at 247–48, 106 S.Ct. 2505 ("As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.... That is, while the materiality determination rests on the substantive law, it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs."). The existence of "*some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment[.]" *Id.* Where the nonmoving party only proffers evidence that is "merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249–50, 106 S.Ct. 2505 (citations omitted).

The party moving for summary judgment has the initial burden of demonstrating the absence of any genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)

(holding the movant must meet its burden "by 'showing'—that is, pointing out to the [trial court]—that there is an absence of evidence to support the nonmoving party's case."). The moving party may need only to support its motion with "solely ... the pleadings, depositions, answers to interrogatories, and admissions on file." *Id.* at 324, 106 S.Ct. 2548; *see also Crown Operations Int'l, Ltd. v. Solutia, Inc.*, 289 F.3d 1367, 1375 (Fed.Cir. 2002). If the moving party carries its burden to demonstrate an absence of any genuine issue of material fact, then the burden of proof shifts to the non-moving party to show a genuine factual dispute exists. *See Sweats Fashions, Inc. v. Pannill Knitting Co., Inc.*, 833 F.2d 1560, 1563 (Fed.Cir.1987). An issue is genuine only if it might prompt a reasonable fact-finder to resolve a factual matter in favor of the non-moving party. *Id.* at 1562–63. The court is required to resolve any doubts about factual issues in favor of the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). In addition, all presumptions and reasonable inferences must be resolved in favor of the non-moving party. *See Anderson*, 477 U.S. at 255, 106 S.Ct. 2505; *Gasser Chair Co., Inc. v. Infanti Chair Mfg. Corp.*, 60 F.3d 770, 773 (Fed.Cir.1995).

The fact that both parties in this case have moved for summary judgment does not relieve the court of its responsibility to determine the appropriateness of summary disposition. *See Prineville Sawmill Co. v. United States*, 859 F.2d 905, 911 (Fed.Cir.1988). Summary judgment will not necessarily be granted to one party or another when both parties have filed motions. *Id.* (citing *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390 (Fed.Cir.1987)). The court must evaluate each party's motion on its own merits. *Id.*

## C. Resolution Of The Claims At Issue.

### 1. Palmetto Federal's Breach Of Contract Claim (Count I).

Palmetto Federal alleges that the enactment of FIRREA on August 9, 1989 breached an agreement with the FHLBB "that, upon Palmetto's acquisition of First Federal through merger, and the approval by the FHLBB of Palmetto's application for approval, supervisory goodwill in the amount of $23,225,000 would be treated as a capital asset for regulatory purposes." Compl. ¶ 49; *see also* Pl.App. B (Hickey Dep. at 995) ("The alleged contract was very simply this: If you take over this failed institution so we don't have to, the insurance fund is not in very good shape so you would help us out, we'll let you do it this way. So we said okay. And then you didn't let us do it that way.... I am sure there were verbal agreements; but since they can't be proven, because of the length of time—in fact, some people have died and everything—that from the verbal agreements come implied contracts.").

■ In order to establish breach of contract by the federal government, a plaintiff must first establish a "binding agreement." *Anderson v. United States*, 344 F.3d 1343, 1353 (Fed.Cir.2003). The four elements required to establish a binding agreement are: 1) mutuality of intent to contract; 2) lack of ambiguity in offer and acceptance; 3) consideration; and 4) that the government representative had actual authority to bind the United States. *Id.; see also California Fed. Bank, FSB v. United States*, 245 F.3d 1342, 1346 (Fed.Cir.2001); *First Commerce*, 335 F.3d at 1379–80; *D & N Bank*, 331 F.3d at 1378. Whether plaintiffs' contractual claims in this case arise from a breach of an express contract or breach of an implied-in-fact contract, the elements are the same. *See Maher v. United States*, 314 F.3d 600, 606 (Fed.Cir. 2002) (holding an implied-in-fact contract is "founded upon a meeting of minds, which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding.").

### a. Neither The Merger Agreement Nor FHLBB Resolution No. 82–4–175 Evidences Mutuality Of Intent Regarding The Treatment Of Supervisory Goodwill.

■ The threshold contractual element is mutuality of intent, which a plaintiff must establish by objective evidence of the exis-

tence of an offer and reciprocal acceptance. *See Anderson,* 344 F.3d at 1355 (quoting RESTATEMENT (SECOND) OF CONTRACTS § 18 (1981)) ("For a contract to be formed once an offer is made, there must be an acceptance, *i.e.,* a 'manifestation of assent to the terms thereof made by the offeree in a manner invited or required by the offer.' ").

The Merger Agreement does not refer to the purchase method of accounting, although the application for merger shows a checked box titled "Purchase of Assets." *Compare* Pl.App. C (Tab 51 at 2225–30) *with* Pl.App. C (Tab 51 at 2216). Attached to the application is a document titled "Proposed Accounting Procedures to Be Followed" together with an opinion from an independent public accountant firm, however, these documents simply reflect that Palmetto Federal planned to amortize goodwill on a straightline basis over 27 years. *Id.* at 2221, 2259, 2269–76. Assuming *arguendo* that these documents could constitute a bona fide offer, the record fails to evidence that the Government accepted.

■ FHLBB Resolution No. 82–4–175 contains four conditions that Palmetto Federal had to satisfy in order to obtain the Government's approval of the merger. *See* Pl. App. C (Tab 52 at 2286–87). Condition 4 requires only that Palmetto Federal submit a detailed accounting analysis of the supervisory goodwill resulting from the purchase method of accounting and the submission of an accountant's letter. This requirement, however, does not establish mutuality of intent regarding the regulatory treatment of supervisory goodwill. *See Cain v. United States,* 350 F.3d 1309, 1315 (Fed.Cir.2003); *Anderson,* 344 F.3d at 1355; *D & N Bank,* 331 F.3d at 1377–78.

Accordingly, plaintiff has failed to establish the threshold requirement of mutuality of intent.

### b. Regulatory Approval Of The Merger Alone Does Not Establish Intent To Contract.

■ In *D & N Bank,* the Federal Circuit stated: "Mere approval of the merger does not amount to [an] intent to contract. The Bank Board, in its regulatory capacity, must approve all mergers. An agency's performance of its regulatory or sovereign functions does not create contractual obligations.... *Something more is necessary.*" 331 F.3d at 1378–79 (emphasis added). Therefore, a merger agreement conditioned upon government approval of the purchase method of accounting; internal government memoranda; a FHLBB Resolution conditioning approval of the merger on the submission of detailed accounting analyses of the supervisory goodwill resulting from the purchase method of accounting; and the submission of an accountant's letter satisfying the condition of the Resolution, together were held insufficient as a matter of law to establish mutuality of intent. *Id.* at 1378. The Federal Circuit determined that the FHLBB Resolution only showed approval of the merger and that none of the documents "purports to be a contract between [the thrift] and the government or indicates that it binds parties on either side of this transaction." *Id.*

In *Anderson,* an Application for Supervisory Conversion was submitted to the FHLBB that requested certain forbearances and use of the purchase method of accounting to amortize goodwill over a period of 40 years. *See* 344 F.3d at 1347. The FHLBB approved of the application without mention of any forbearance or goodwill amortization. *Id.* at 1348. Thereafter, as required by one of the approval conditions of the FHLBB Resolution, the merged thrift amortized the goodwill over a period of 25 years. *Id.* The merged thrift subsequently could not meet FIRREA's capital requirements and was seized by the OTS. *Id.* Although the Federal Circuit determined that the plaintiff made an offer, in the form of an Application for Supervisory Conversion, to acquire a failing thrift in exchange for the ability to amortize supervisory goodwill over a period of time, neither the FHLBB Resolution nor Forbearance Letter were held to evidence "manifest assent" regarding the extended amortization of goodwill. *Id.* at 1355. The Resolution only required the plaintiff to furnish an independent accountant's letter describing the treatment of goodwill resulting from the purchase method of accounting. *Id.* Again, the Federal Circuit concluded that a goodwill accounting provision was merely "a regulato-

ry condition rather than a statement of mutual assent." *Id.* (citing *D & N Bank v. United States*, 331 F.3d at 1378).

Where a mutual thrift was permitted by the FHLBB to treat the loss on the sale of low-interest loans as part of its regulatory capital requirements and amortize the loss over a period of years, the Federal Circuit again ascertain that "something more" was missing. *See Cain*, 350 F.3d at 1311. In order to halt its deteriorating condition, the mutual thrift converted to a stock institution. *Id.* After extensive negotiations with the FHLBB, the thrift was allowed to convert on the condition that the thrift use the "pushdown" method of accounting as it continued using the losses as part of its regulatory capital. *Id.* at 1312. The enactment of FIRREA significantly limited the thrifts use of losses as assets for the purpose of regulatory capital and resulted in the thrift failing to comply with minimal capital standards. *Id.* at 1313. The Federal Circuit held that a FHLBB letter, which listed seven conditions the thrift must meet in order to convert to a stock institution, did not evidence "any contractual commitment by the [FHLBB] to the [thrift]." *Id.* at 1315. In fact, the FHLBB's action was found to be "nothing more than [its] performance of its regulatory function." *Id.* Accordingly, the authorization of the thrift's practice of using losses as assets for regulatory capital was not deemed a contract. *Id.* at 1316.

### i. The FHLBB's Encouragement Of Supervisory Mergers Does Not Evidence A Contract.

Plaintiffs implicitly argue that the FHLBB's encouragement of the merger be-

tween Palmetto Federal and First Federal evidences "something more" to establish a contract. *See* Pl. Mot. at 14–16. The record shows that from 1979–82, Palmetto Federal and First Federal had numerous telephone contacts with the FHLBB. *See* Pl.App. D at 3137–40.[8] During 1980 to 1982, a FHLBB Supervisory Agent also scheduled several meetings with Palmetto Federal and First Federal, including a meeting about a possible merger. *Id.* The main purpose of the meetings, however, was to discuss the development of Fripp Island. *See* Pl.App. C (Tab 91 at 2593).[9] In addition, it appears that Coppers & Lybrand accountant for Palmetto Federal and First Federal may have contacted the FHLBB Supervisory Agent on or around March 30 or 31, 1982 about the merger between Palmetto Federal and First Federal. *See* Pl.App. B (Rowell Dep. at 1472, 1483–84, 1486–90, 1522–23); Pl.App. C (Tab 68 at 2470–71). The FHLBB Supervisory Agent, however, does not remember encouraging Palmetto Federal to merge with First Federal. *See* Def.App. (Cohrs Dep. at 762–69).

Although the FHLBB and FSLIC clearly encouraged supervisory mergers during this period, no one at the agencies can remember encouraging the specific merger between Palmetto Federal and First Federal. *See* Def.App. (Cohrs Dep. at 762–69); 772–77; 796–97.[10] Apparently, most of the directors and employees of Palmetto Federal learned about the FHLBB's alleged encouragement of the merger from the now-deceased CEO of Palmetto Federal. *See* Pl.App. B (Cunningham Dep.) at 811, 896.[11] The former

---

**8.** *See also* Pl.App. C (Tab 92 at 2594–2600); Pl. App. C (Tab 93 at 2610, 2614–15, 2618, 2622–26).

**9.** *See also* Pl.App. C (Tab 94 at 2634); Pl.App. C (Tab 95 at 2636); Pl.App. C (Tab 96 at 2638); Pl.App. C (Tab 97 at 2640); Pl.App. C (Tab 98 at 2642).

**10.** *See also* Pl.App. B (Beesley Dep. at 193–94) (admitting that the use of purchase method of accounting "was a major factor in mergers during that period" or a "significant inducement[.]"); Pl.App. B (Connell Dep. at 559–60, 571, 644–47, 659); Pl.App. B (Rowell Dep. at 1522, 1527); Pl.App. C (Tab 41—Connell Aff. at 1938–40).

**11.** *See also* Pl.App. B (Cunningham Dep. at 812–13, 883, 892) (stating that he cannot remember the FHLBB encouraging a merger between the two thrifts even though he remembers a meeting between the thrifts and the FHLBB in Atlanta) *but see* (*id.* at 813–14, 883–86 stating that the regulators were encouraging goodwill); Pl.App. B (Hickey Dep. at 990, 997–99); Pl.App. B (Peters Dep. at 1192, 1231–32); Pl.App. B (Rains Dep. at 1385–86); Pl.App. B (Ropp Dep. at 1401–02, 1407–08, 1414–16, 1437, 1439); Pl.App. B (Rowell Dep. at 1519–21) (claiming that Mr. Holley told him that he had discussed the merger of Palmetto Federal and First Federal with the FHLBB in 1981) and (*id.* at 1520) ("In my view, in my memory, [Mr. Holley] indicated that the

CEO of First Federal also was apparently the main source regarding the FHLBB's alleged suggestion and encouragement of the merger. *See* Pl.App. B (Trask Dep. at 1851, 1857, 1864–66) (the FHLBB's encouragement of the merger with Palmetto Federal was discussed at First Federal's board meetings).[12]

The similarity between this case and *First Commerce* is striking. In *First Commerce,* the Federal Circuit held that plaintiff's vague references to "unspecified 'incentives' and 'various accounting and operating forbearances' held out by the [FHLBB] to encourage First Commerce to acquire Mutual Federal," as a matter of law, was insufficient to establish an offer. *See* 335 F.3d at 1380. Here, almost all the deposition testimony about the FHLBB's alleged suggestion and encouragement of the merger between Palmetto Federal and First Federal is derived from hearsay statements allegedly made by the former CEOs, both of whom are dead. The FHLBB's phone logs and calendar entries, including one noting a meeting in At-

lanta, are inconclusive. Viewed in the light most favorable to plaintiffs, such evidence shows at best only that a meeting took place. The court is not at liberty simply to assume an offer and acceptance regarding the regulated treatment of supervisory goodwill without "something more."

In the alternative, plaintiff asserts that the supervisory nature of the merger evidences a contractual obligation regarding regulatory goodwill. *See* Pl.App. B (Rains Dep.) at 1308 (stating that "it was generally understood ... that it was a supervisory merger.").[13] In *D & N Bank,* however, the Federal Circuit observed that labeling a merger to be "supervisory"[14] reveals nothing about the government's intent to contract:

> To assert that the government was acting solely in its regulatory capacity is to assert a conclusion about contractual liability, not a premise that negates it. As we held in *D & N Bank,* the supervisory nature of the business transaction is not 'probative of the government's intent to contract.' *D & N Bank,* at 1380.

regulators would be encouraged by his acquisition of [First Federal]."); Pl.App. C (Tab 45—Oct. 16, 1991 Rains congressional testimony at 1974) ( "I can tell you that obviously [goodwill] was allowed and it was encouraged."); Def.App. (Cunningham Dep. at 778–85).

**12.** *See also* Def.App. (Smith Dep. at 793) (relating that Eason said that the merger "made sense, that [First Federal] was stronger in the lending side and Palmetto Federal was stronger in the savings side, that the marriage would be a good one[.]"); Pl.App. B (Cummings Dep. at 788) ("I don't know whether it was written, but we were told periodically that, you know, that we were encouraged by the regulators to merge.") and (*id.* at 792) ("We thought, or I thought that [goodwill] was the carrot that would entice somebody to want to merge with First Federal."); Pl.App. B (Smith Dep. at 1153, 1160, 1162) (noting that Eason told her that the FHLBB was involved in the merger).

**13.** The evidence proffered on this issue is either conflicting or indicates that the merger was voluntary. *See* Pl.App. B (Cohrs Dep. at 409, 463–64) (labeling the merger as being unassisted or voluntary); Pl.App. B (Connell Dep. at 643, 646) (stating that First Federal was a supervisory case) and (*id.* at 660) (the merger was "voluntary"); Pl.App. B (Rowell Dep. at 1475) (not characterizing the merger between the two banks

as a "voluntary merger" because both banks were in a weak financial condition); Pl.App. B (Rundle Dep. at 1655, 1661, 1668–69) (noting that the merger between Palmetto Federal and First Federal was a supervisory merger resulting in supervisory goodwill, but then later stating that the merger appeared to be non-supervisory upon examination of the exhibits); Pl.App. B (Widenhouse Dep. at 1892) (the decision to merge was voluntary on the part of First Federal); Pl.App. C (Rains' Oct. 16, 1991 congressional testimony at 1974); Pl.App. C (Tab 50—April 16, 1982 FHLBB Memo on Merger Application at 2209–10); Pl.App. E (Johnson Dep. at 3466); Def. Supp. Resp. (Johnson Report at 5) ("Palmetto's acquisition of First Federal was a voluntary and unassisted combination of two entities with comparable financial conditions.") and (*id.* at 9–11) ("Palmetto's acquisition of First Federal was a voluntary, unassisted merger of two equal, capital-compliant and solvent thrifts."); Def. Supp. Resp. (Rochester Report at 9) ("The merger between Palmetto and First Federal was treated as a voluntary, unassisted merger of two fairly comparable institutions."); Def. Supp. Resp. (Johnson Dep. at 52–53) (stating that the merger was voluntary).

**14.** A supervisory merger is "one involving an association which, in the opinion of the supervisory agent, is suffering substantial operating and/or financial problems." Def.App. at 105.

*First Commerce Corp. v. United States*, 335 F.3d 1373, 1383 (Fed.Cir.2003); *see also D & N Bank*, 331 F.3d at 1378.

### ii. The FHLBB's Approval Of The Merger Of A Financially Weak Institution Does Not Evidence Any Contractual Obligation Regarding The Treatment Of Regulatory Goodwill.

■ Plaintiffs argue that First Federal's financial condition was such that a merger with that institution without the use of the purchase method of accounting and resulting goodwill would have been "irrational" or "madness." *See* Pl. Mot. at 35.[15] The evidence on this point also is conflicting. *See* Def. Supp. Resp. (Johnson Report) at 9–11.[16] Taken in the light most favorable to plaintiffs, the merger would not have made economic sense without the use of the purchase method of accounting and the resulting goodwill, however, this fact alone has never been deemed sufficient by the Federal Circuit to establish mutuality of intent. At best, the evidence in this case shows that the Government merely approved the merger of Palmetto Federal and First Federal and did not enter into an express or implied-in-fact contract relating to the transaction. *See D & N Bank*, 331 F.3d at 1382.

For these reasons, the court grants the Government's motion for summary judgment as to Count I.

### 2. Palfed's Breach Of Contract Claim (Count VI).

■ Palfed has asserted a breach of contract based on the FHLBB Approval Resolution's recitation of Palmetto Federal's net worth and subsequent approval of Palfed's application to acquire Palmetto Federal. *See* Compl. at ¶ 73. Palfed further alleges that it only entered into that contract based on the assurances by the Government that the goodwill resulting from the merger of Palmetto Federal and First Federal could be used to satisfy capital requirements. *Id.* at ¶ 74. Therefore, Palfed contends that the enactment of FIRREA and the implementing regulations breached Palfed's contract. *Id.; see also* Pl.App. B (Hickey Dep. at 1004, 1017) (stating that Palfed's theory of recovery is that it suffered a loss when its wholly-owned subsidiary was damaged).

Again, the record fails to evidence that the Government agreed to enter any contract with Palfed regarding the amortization of goodwill. In fact, the FHLBB's Resolution does not reference goodwill:

> 3.b. PALFED shall stipulate in writing to the Corporation that as long as it controls Palmetto, PALFED will cause the net worth of Palmetto to be maintained at a level consistent with that required by Section 563.13(b) of the Rules and Regulations for Insurance of Accounts, as now or hereafter in effect, and, as necessary, will in-

15. *See also* Pl.App. B (Beesley Dep. at 188) (stating that back in the late–70s and early–80s most thrifts would have been insolvent if they had been marked to market); Pl.App. B (Connell Dep. at 654) (stating that First Federal was nearing insolvency at the time of the merger) *see also* (*id.* at 648–49, 658, 666); Pl.App. B (Cummings Dep. at 786, 789–90, 802–03) (relating that First Federal was in financial trouble according to Eason); Pl.App. B (Hickey Dep. at 989–90); Pl.App. B (Ropp Dep. at 1427) (stating that he thought Palmetto Federal was in "pretty fair condition" and "doing better" than First Federal before the merger); Pl.App. B (Rowell Dep. at 1515–16, 1518) (stating that at the end of 1981 First Federal's financial condition was deteriorating because the non-performing assets were significantly greater than the net worth and it had above average expenses); Pl.App. B (Trask Dep. at 1852); Pl.App. B (Widenhouse Dep. at 1887, 1900–01); Pl.App. C (Tab 62 at 2326); Pl.App. C (Tab 64 at 2344, 2383–86); Pl.App. C (Tab 65 at 2413); Pl.App. D at 3127; Pl.App. E

(Johnson Dep. at 3463) ("I think one would not have done this transaction as a purchase transaction without some reasonable expectation that the goodwill would be available[.]") *but see* (*id.* at 3465) (stating that both companies appear to be equals); Rains Supp. Aff. at ¶ 7 (stating that without the use of purchase method of accounting and favorable regulatory treatment afforded to goodwill, the merger would not have made sense because it would have put Palmetto Federal into insolvency on a tangible basis once First Federal's assets were marked to fair market value).

16. *See also* Def. Resp. (Barry Report at 2–3, 5, 9); Def. Resp. (Rochester Report at 8–9); Def. Resp. (Johnson Dep. at 48–49); Pl.App. B (Cohrs Dep. at 446) (stating that Palmetto Federal and First Federal "were pretty comparable[.]"); Pl.App. B (Rundle Dep. at 1669) *but see* (*id.* at 1670) (First Federal was insolvent based on its liabilities exceeding its assets after they were marked to market).

fuse sufficient additional equity capital, in a form satisfactory to the Supervisory Agent, to effect compliance with such requirement.

Pl.App. C (Tab 38 at 1920). Assuming *arguendo* that Palfed's application could be construed as an offer regarding the treatment of goodwill, the FHLBB's conditional approval and Palfed's subsequent satisfaction of the FHLBB's conditions do not evidence "something more" required to establish an acceptance by the Government, *i.e.*, mutuality of intent. *See Cain,* 350 F.3d at 1315; *Anderson,* 344 F.3d at 1355; *D & N Bank,* 331 F.3d at 1378.

Finally, the "course of conduct" between plaintiffs and the Government did not evidence an agreement to amortize the goodwill on a straightline basis over 27 years as originally proposed, since plaintiffs unilaterally changed the length of goodwill amortization several times without consulting the Government. *See* Pl.App. B (Hickey Dep. at 1041–42, 991–93).

Accordingly, the Government's motion for summary judgment as to Count VI of plaintiffs' complaint is granted.

## CONCLUSION

The court grants the Government's October 10, 2000 motion for summary judgment on Counts I and VI. Plaintiffs' October 6, 2000 partial motion for summary judgment as to liability is denied as moot. The plaintiffs' August 3, 1995 complaint is dismissed. The Clerk of Court is ORDERED to enter a final judgment consistent with this opinion.

IT IS SO ORDERED.