ARMED SERVICES BOARD OF CONTRACT APPEALS

| | | |
|---|---|---|
| Appeal of -- | ) | |
| | ) | |
| Potomac Electric Corp. | ) | ASBCA No. 61371 |
| | ) | |
| Under Contract No. SPRRA2-17-D-0028 | ) | |

APPEARANCE FOR THE APPELLANT:        Mr. Leny Chertov
                                                                        V.P. Operations

APPEARANCES FOR THE GOVERNMENT:   Daniel K. Poling, Esq.
                                                                        DLA Chief Trial Attorney
                                                                        Edward R. Murray, Esq.
                                                                        Trial Attorney
                                                                        DLA Aviation
                                                                        Richmond, VA

OPINION BY ADMINISTRATIVE JUDGE YOUNG

This appeal arises from costs incurred by Potomac Electric Corporation (Potomac or appellant) in the performance of a contract allegedly awarded to it by the Defense Logistics Agency (DLA or government). DLA argues that no contract existed. Appellant elected to proceed under Board Rule 12.2,[1] Expedited Procedures, and both parties agreed to waive a hearing and submit their cases on the written record pursuant to Board Rule 11. Both entitlement and quantum are before us. We find that a contract existed and that it was terminated by the government. We sustain the appeal.

FINDINGS OF FACT

1. On June 19, 2017, DLA issued Standard Form 33, Solicitation, Offer and Award No. SPRRA2-17-R-0053 (the solicitation) as a small business set-aside for a firm-fixed-price, indefinite-delivery, indefinite-quantity (IDIQ) type contract for direct current motors (R4, tab 1 at 1-4). The solicitation provided for the purchase of 200 motors in the base year, and 150 motors in each of four option years (R4, tab 1 at 5-11). The guaranteed minimum was 150 motors (R4, tab 1 at 4). The solicitation required delivery of the 200 motors in the base year 255 days after contract award (R4, tab 1 at 14). The solicitation closed on July 7, 2017 (R4, tab 1 at 1).

---

[1] Pursuant to the Rules of the Board, a decision under Rule 12.2 shall have no value as precedent, and in the absence of fraud, shall be final and conclusive and may not be appealed or set aside.

2. On July 7, 2017, Potomac submitted a proposal. The total price proposed for the base and four option years was $3,319,786.22 (R4, tab 2 at 1-2, 27). The base year contemplated the delivery of 200 motors for $784,476.00, with delivery 255 days after award (R4, tab 2 at 27). On July 13, 2017, DLA contract specialist Mr. Harrison A. Mayfield (the contract specialist) sent Potomac an email confirming receipt of its proposal (R4, tab 3 at 1).

3. On August 15, 2017, the contract specialist sent an email to Potomac, stating: "Attached is a draft copy of contract SPRRA2- 17-D-0028 and delivery order 0001. Please review, if everything is ok, have [sic] sign both, the basic contract and delivery order and return to me for processing" (R4, tab 3 at 1).

4. The contract specialist's email attached an Award/Contract Standard Form 26 (SF-26), No. SPRRA2-1 7-D-0028 (the contract)[2] showing that it was awarded to Potomac Electric Corp. (R4, tab 3 at 1-4). The contract did not bear a watermark identifying it as a draft, or indicate it was a draft in any way. The delivery order, DD Form 1155, Order for Supplies or Services (delivery order or DO), also attached to the email, ordered 200 motors for $784,476.00, which mirrored Potomac's proposal. The DO set a delivery date of January 31, 2018 (169 days after award) (R4, tab 3 at 4, 49-52). The contract incorporated by reference the Federal Acquisition Regulation (FAR) 52.249-2, TERMINATION FOR CONVENIENCE OF THE GOVERNMENT (FIXED-PRICE) (APRIL 2012) (R4, tab 3 at 40).

5. The contract and delivery order identified the name of the contracting officer (CO) as Angela L. Clark and included her email and phone number, but these documents were unsigned (R4, tab 3 at 4, 49). The contract specialist did not have authority to bind the government (R4, tab 24). By signed declaration, the CO stated that she did not direct the contract specialist to send the draft award to the contractor (R4, tab 25).

6. On August 15, 2017, Potomac emailed the contract specialist, stating:

> "The solicitation...requested [delivery of 200 units] 255 days after the award. The document we received this morning, SPRRA2-17-D-0028/0001...states delivery date of 200 units as January 31, 2018 [169 days after award]. Potomac Electric's price proposal is based

---

[2] Whether a contract existed is a central issue in this appeal. For ease of reference, this document will be referred to as "the contract" as distinguishable from SPRRA2-17-R-0053 ("the solicitation").

on the Solicitation's 255 days delivery request. Could
you please clarify?"

(R4, tab 4 at 2-3)

7. On August 16, 2017, the contract specialist responded: "You are correct, I adjusted the delivery date. Attached is the corrected delivery schedule, if everything is ok, have [sic] sign both the basic contract and delivery order 0001 and return to me for processing." (R4, tab 4 at 2) The contract specialist attached a corrected SF-26 and DO, showing the delivery date as 255 days after award (R4, tab 20 at 17, 72).

8. The same day, August 16, 2017, Potomac emailed the contract specialist posing three technical questions. Potomac stated that the solicitation did not address certain technical details which made a difference between model numbers of the motors Potomac needed to purchase in performance of the contract. (R4, tab 4 at 1-2) The contract specialist did not respond to Potomac's technical questions, but on August 17, 2017, he forwarded them to Mr. Henry W. Daniels, III, to respond to them (*id.* at 1). Mr. Daniels is also a contracting officer (R4, tab 11 at 1) and appears copied in almost every correspondence with or regarding Potomac (R4, tabs 4, 7, 11-13, 16, 20).

9. On August 18, 2017, the CO reviewed, made edits, and signed a final price negotiation memorandum (FPNM), which reflected Potomac's proposal (R4, tab 25). The FPNM stated:

> The Government will accept Potomac Electric proposed price, as is.... The responsive offer received from Potomac Electric Corp at a total price of $3,319,785.00 is considered fair and reasonable based on adequate price competition.... Contract number is SPRRA2-17-D-0028.

(R4, tab 5 at 2, 7)

10. The same day, August 18, 2017, Potomac signed and dated the contract and DO, and emailed them to the contract specialist on August 19, 2017. In the same email, Potomac also stated: "The 200 units release has extremely tight schedule and Potomac must get started right away." Potomac also asked the contract specialist to address the technical questions it had posed in its email of August 16, 2017. (Finding 8; R4, tab 6 at 1, 7)

11. In order to meet the "extremely tight schedule" Potomac set its team of contract managers, engineers, and purchase personnel to work on the contract

3

round-the-clock, reviewing the technical specifications and negotiating with vendors to place purchase orders for the motors (R4, tab 22). Potomac stated that "[being] a small company, we all worked on the contract" including weekends. Potomac did not purchase materials. (R4, tab 23)

12. On August 23, 2017, the contract specialist sent an email to the CO and to Mr. Daniels forwarding the contract and DO signed by Potomac, as well as Potomac's technical questions (finding 8), stating: "Potomac has signed the basic contract and delivery order, but still wants the questions address[ed] below. If you can sign these two documents and award it in PADDs[3] I can get distribution out hopefully today." (R4, tab 7 at 1)

13. On August 28, 2017, the CO signed a Contract Clearance Request (CCR) requesting review and approval of the FPNM which, as found above, reflected Potomac's proposal (finding 9; R4, tab 10).

14. Also on August 28, 2017, as shown by internal correspondence (R4, tabs 8-9), DLA realized that it needed to receive the motors in a shorter time frame than initially anticipated. DLA determined that the requirement was urgent and compelling and decided to change the structure of the purchase, as reflected in a determination and findings (D&F) which also mirrors Potomac's proposal (R4, tab 8 at 4).[4] DLA decided it would purchase 200 motors on an urgent and compelling basis for delivery 135 days after award, and that future quantities of motors would be procured under an ID/IQ contract (R4, tab 9 at 1). On August 29, 2017, DLA issued an amendment to the solicitation, to purchase 200 motors with a delivery date of 165 days after award, and deleted the remainder of the motors from the procurement (R4, tab 11 at 3, 5).

15. On August 29, 2017, the contract specialist sent an email to Potomac enclosing the amended solicitation, stating:

> Please see attached solicitation amendment.
> Sorry to inform you. Subject solicitation had to be

---

[3] PADDs is believed to mean Procurement Automated and Documents System.

[4] DLA's internal correspondence centers on the premise that an urgent and compelling requirement does not need to be synopsized. This is noteworthy, as DLA's email to Potomac of September 7, 2017, recognizes that the government failed to synopsize the first solicitation which is "a violation of the FAR" (R4, tab 14 at 3). DLA's course of action changing the structure of the purchase suggests an attempt by the government to correct the failure to synopsize the solicitation by restructuring the purchase as an urgent and compelling requirement which does not need to be synopsized.

4

changed due to this requirement being Urgent and Compelling. Instead of a 5 year Indefinite Delivery Indefinite Quantity (IDIQ), it is now a One-Time Buy for a quantity of 200 each. When proposal is submitted, please copy everyone on email. Any questions, notify Contracting Officers Henry Daniels and Angela Clark.

(R4, tab 11 at 1)

16. On the same day, August 29, 2017, Potomac responded via email:

Only after our phone conversation with Mr. Daniels this morning we realized the following: The DLA sent us the amendment of the solicitation SPRRA2-17-0053.

1. The solicitation SPRRA2-17-0053 had closed on July 7, 4:30PM, 2017 ET.
2. The government did not conduct any discussions or negotiations with Potomac Electric in reference to our proposal[.]
3. We received the award letter from Mr. Harrison [the contract specialist] on August 16th, 2017. We signed the contract (and first year release) a few days later and proceeded with procurement of materials. We also wrote to Mr. Harrison several times on contractual matters.

It appears to Potomac Electric that the government decided to nullify our award, reopen the solicitation that has been closed a month ago, amended it and is now seeking new proposals from suppliers.

(R4, tab 12 at 1)

17. On September 7, 2017, the chief of DLA tactical division sent Potomac an email, stating:

Please let me start by apologizing for all the hardship we have put you through with this requirement. I do want to reassure you however, that although we committed errors along the way, we are

trying to correct these errors and proceed with the utmost standards.

....

1. The initial solicitation SPRRA2-17-R-0053, Direct Current Motor, quantity of 800 (Year 1=200) was solicited as a 5 year IDIQ. However, *the requirement was not synopsized, which violated FAR 5.101 and 5.102.* We mistakenly thought we could avoid a synopsis because the first delivery order would be issued to satisfy an urgent requirement.

....

6. Since the solicitation was never awarded, a debriefing was not and shall not be conducted with any other interested bidders.

(R4, tab 14 at 2-3) (Emphasis added)

18. On October 2, 2017, Potomac submitted a claim to the CO for $27,000 for costs incurred in the performance of the contract between August 16, 2017, the date of putative contract award, and August 29, 2017, the date Potomac stopped working on the contract (R4, tab 15 at 1). Potomac claimed it incurred expenses in reviewing the contract, conducting production simulation and planning, contacting vendors to negotiate delivery and to place purchase orders, placing ads to hire additional personnel to meet the large requirement, and contacting vendors after August 29, 2017, to cancel orders (*id.* at 2).

19. On October 4, 2017, the CO sent an email to Potomac stating that since no contract had been awarded to Potomac, she "lack[ed] jurisdiction" to resolve Potomac's request for monetary compensation and that no further action would be taken upon Potomac's request (R4, tab 16).

20. On October 15, 2017, Potomac submitted an appeal with the Board from the email denying its claim dated October 2, 2017 (finding 18). The Board docketed the appeal as ASBCA No. 61371.

21. Potomac's claim of October 2, 2017, in the amount of $27,000, is further explained in Potomac's letter dated April 22, 2019, (R4, tab 22 at 2, 4), to include: $6,256 for 214 hours of direct labor costs; $16,954 of overhead (at the rate of 271.4%);

6

and $5,539 in general and administrative costs (at the rate of 21.6%) (R4, tab 22 at 4).[5] These rates, as well as a profit rate of 8%, were included in Potomac's price proposal (R4, tab 2 at 48), which the government found fair and reasonable in the FPNM (finding 9; R4, tab 5 at 7). Potomac asserts that "[Our] cost accounting system was audited by the DCMA [Defense Contract Management Agency] during the solicitation process leading to the award of the [contract] and DCMA found our accounting practices in full compliance" (Rule 4, tab 22 at 2). Potomac submitted spreadsheets in support of its claim, and states it did not keep track of hours expended because this was a firm-fixed-price, not a cost-type contract, and its employees were paid fixed salaries which were reflected in the spreadsheets (R4, tab 23 at 2). Potomac also asserts it incurred $3,400 in attorney fees related to filing a protest (R4, tab 22 at 2, 5). The attorney fees were not included in Potomac's claim submitted to the CO on October 2, 2017 (R4, tab 15).

## DECISION

*I. Jurisdiction*

Our jurisdiction arises from the Contract Disputes Act, 41 U.S.C. §§ 7101-7109, which requires a contract between appellant and the United States. If there were no contract between the parties, the Board would have no jurisdiction to entertain this appeal. However, an appellant need only make a "non-frivolous allegation" of a contract to establish the Board's jurisdiction. *Leviathan Corporation*, ASBCA No. 58659, 16-1 BCA ¶ 36,372 at 177,294 (citing *Engage Learning, Inc. v. Salazar*, 660 F.3d 1346, 1353 (Fed. Cir. 2011)). "This burden does not require appellant to prove that a contract actually exists, as that question goes to the merits of appellant's claim rather than the Board's jurisdiction." *Anis Avasta Construction Co.*, ASBCA No. 61107, 17-1 BCA ¶ 36,838 at 179,517 n.2. Here, Potomac has met this low burden alleging it was awarded Contract No. SPRRA2-17-D-0028 on August 15, 2017 (compl. ¶ 2). Therefore, the Board has jurisdiction over this appeal.

*II. Was there a contractual relationship between the parties?*

Appellant argues that it was awarded a contract by DLA (app. br. at 2-3). The government argues that no contract existed (gov't br. at 12-16). The elements of proof to establish a valid contract with the government are: "(1) mutuality of intent to contract; (2) lack of ambiguity in offer and acceptance; (3) consideration; and (4) a government representative having actual authority to bind the United States in contract."

---

[5] These amounts add up to $28,749, as contrasted with the amount of Potomac's claim, $27,000. There is no explanation in the record for this discrepancy. As the claim Potomac submitted to the contracting officer was for $27,000, the Board determines $27,000 is the amount of Potomac's claim.

7

*Anderson v. United States,* 344 F.3d 1343, 1353 (Fed. Cir. 2003); *see also City of El Centro v. United States*, 922 F.2d 816, 820 (Fed. Cir. 1990). Next, we examine whether each element existed to form a contract in the case at hand.

### A. Mutuality of intent to contract

Mutuality of intent is essential to the formation of a contract with the government. *ASFA Construction Industry And Trade, Inc.,* ASBCA No. 57269, 15-1 BCA ¶ 36,034 at 176,004 (citing *Walsh Constr. Co. of Ill.,* ASBCA No. 52952, 02-2 BCA ¶ 32,004 at 158,279, aff'd, 80 F. App'x 679 (Fed. Cir. 2003)). To satisfy its burden to prove mutuality of intent, appellant must show, by objective evidence, the existence of an offer and reciprocal acceptance. *Anderson,* 344 F.3d at 1353; *Yonir Technologies Inc.,* ASBCA No. 56736, 10-1 BCA ¶ 34,417 at 169,897.

Once an offer is made, for a contract to be formed, there must be an acceptance of the offer. *Anderson*, 344 F.3d at 1355. "It is essential that 'acceptance of the offer be manifested by conduct that indicates assent to the proposed bargain.'" *Northrop Grumman Sys. Corp. Space Sys. Div.*, ASBCA No. 54774, 10-2 BCA ¶ 34,517 at 170,237 (citations omitted). Potomac offered to sell the government 200 motors in the base year for $784,476.00, with delivery 255 days after award (finding 2). We find this to be an unambiguous offer. The contract specialist sent Potomac a document titled "Award/Contract" bearing a contract number, which mirrored Potomac's offer except for a discrepancy in the delivery deadline (finding 4), which the contract specialist promptly corrected (finding 7), again mirroring Potomac's offer. This conduct manifests the government's assent to the proposed bargain. We find that mutuality of intent to contract is present in the appeal at hand.[6]

### B. Consideration

To constitute consideration, a performance or a return promise must be bargained for. A performance or return promise is bargained for if it is sought by the promisor in exchange for his promise and is given by the promisee in exchange for that promise. RESTATEMENT (SECOND) CONTRACTS § 71 (1981). Generally,

---

[6] DLA argues that there was no mutuality of intent because the government never signed the contract (gov't br. at 15). Whether the contract was signed, however, is not essential to the consummation of the contract. *Anis Avasta,* 17-1 BCA ¶ 36,838 at 179,516 (citing *United States v. Purcell Envelope Co.,* 249 U.S. 313, 319 (1919)). What is necessary is evidence of an intent to be bound. *Anis Avasta,* 17-1 BCA ¶ 36,838 at 179,517 (citations omitted). Here, there was an offer and an acceptance that denoted mutuality of intent to contract. Accordingly, the fact that the government did not sign the contract does not negate that there was a meeting of the minds.

consideration in government contracts is found in the exchange of promises to perform positive duties. The contractor's bid or proposal is a promise to furnish supplies or services offered in exchange for the government's promise to pay for the work. JOHN CIBINIC, JR. & RALPH C. NASH, JR., FORMATION OF GOVERNMENT CONTRACTS at 189 (2nd ed. 1986). *See also Supply & Service Team GmbH*, ASBCA 59630, 17-1 BCA ¶ 36,678 at 178,602 (quoting *Carter v. United States*, 102 Fed. Cl. 61, 66 (2011), finding that the agreement failed for lack of mutual exchange of binding promises.

In the case at hand, Potomac promised to deliver to DLA 200 motors for $784,476.00 in the base year (finding 2). In return, the government both in the contract and the corrected SF-26, promised to pay Potomac $784,476.00 for the delivery of 200 motors (findings 4, 7). We find that the parties intended their promises to be mutually binding. The exchange of promises between Potomac and DLA constitutes consideration in the case at hand.

### C. Lack Of Ambiguity In Offer And Acceptance

A definite offer and an unconditional acceptance must be established to prove the existence of a contract. *Russell Corp. v. United States,* 537 F.2d 474, 481 (Ct. Cl. 1976). As pointed out above, we found that Potomac's offer to sell 200 motors in the base year for $784,476.00, with delivery 255 days after award (finding 2), was mirrored by the SF-26 as corrected by the contract specialist (findings 4, 7). Additionally, other documents in the record mirror the terms of Potomac's offer; for example, the FPNM (finding 9); the D&F (finding 14) and the CCR (finding 13). We find that these facts support that a definite offer and an unconditional acceptance existed. There was no ambiguity as to the terms contemplated by the parties.

### D. Authority On The Part Of The Government Representative To Bind The Government

It is well settled that anyone entering into an arrangement with the government takes the risk of ascertaining that the official purporting to act for the government stays within the bounds of his authority. *Federal Crop Ins. Corp. v. Merrill,* 332 U.S. 380, 384 (1947). In order to prove the elements of a contract, "there needs to be something more than a cloud of evidence...to prove a contract and enforceable contract rights." *D& N Bank v. United States,* 331 F.3d 1374, 1377 (Fed. Cir. 2003).

In the appeal at hand, it is uncontroverted that the contract specialist had no authority to bind the government (finding 5). However, the shadow of the CO looms large over every exchange with Potomac. The CO prepared the FPNM, which mirrored the terms of Potomac's offer and the SF-26 award document, and signed the FPNM on the same date Potomac signed the contract (findings 9-10); on August 28, 2017, the CO prepared and signed the CCR which incorporated the terms of the FPNM (finding 13).

9

The CO was aware of the technical questions Potomac posed so it could order the correct product, aware that Potomac had signed the contract, and aware that Potomac was operating under a tight schedule (finding 12). The CO stated that she did not direct the contract specialist to send the draft award to the contractor (finding 5). However, the record is notably silent as to the communications between the CO and the contract specialist.[7] The Board finds it difficult to believe that there were no communications regarding Potomac between the contract specialist, the CO, and Mr. Daniels. The absence of these communication(s) suggests that if produced, they would be unfavorable to the government "if a party has it peculiarly within his power to produce witnesses whose testimony would elucidate the transaction, the fact that he does not do it creates the presumption that the testimony, if produced, would be unfavorable." *TranLogistics LLC,* ASBCA Nos. 61366, 61450, 19-1 BCA ¶ 37,330 at 181,552-53 (citing *Graves v. United States,* 150 U.S. 118, 121 (1893)).

When considered together, these facts provide more than a "cloud of evidence" that a government official with authority to bind the government was behind DLA's interactions with Potomac, and entered into a contractual relationship with Potomac. The Board finds that the involvement of the CO was significant enough to support the finding that she actually directed the award to Potomac, and the contract specialist only acted in the limited capacity of conveying information.

*III. Costs*

Any government action preventing a contractor from continuing performance should be adjusted for under the termination for convenience clause if the contracting officer could have used the clause at the time of the action. This principle applies where the government elected not to terminate for convenience but rather to end the contractual relationship in some other way. JOHN CIBINIC, JR. & RALPH C. NASH, JR., ADMINISTRATION OF GOVERNMENT CONTRACTS at 1087 (3d ed. 1995) (citing *John Reiner & Co. v. United States,* 325 F.2d 438, 444 (Ct. Cl. 1963)).

As set forth above, we found that a contractual relationship existed between the parties. We also found that, having awarded the contract, DLA decided that it was in the best interest of the government to buy the motors in a different procurement structure. (Findings 14-15, 17) However, DLA did not terminate the contract for convenience as would have been the prescribed course of action when it "ended the

---

[7] In its opinion of March 11, 2019, denying the government's motion for summary judgment, the Board noted the absence in the record of documents reflecting communications between the contracting officer and the contracting specialist (Bd. op. at 10). The Board later ordered that the Rule 4 file be supplemented with relevant documents (Bd. ord. dtd. April 16, 2019) but the record is still devoid of any communications between the CO and the contracting specialist.

contractual relationship in some other way." Instead, to paraphrase Potomac's lay terms, the government decided to nullify the award, reopen the solicitation that had been closed for a month, amend it, and seek new proposals. (Finding 16) DLA's actions had the effect of ending the contractual relationship with Potomac; it follows that the termination for convenience provisions, which were incorporated by reference in the contract (finding 4), apply.

In the appeal at hand, Potomac submitted a claim to the contracting officer for $27,000, which the contracting officer refused to decide asserting that she had "no jurisdiction," because a contract had never been awarded to Potomac (finding 19).

The contract incorporated by reference FAR 52.249-2 (finding 4), which provides that termination costs in a firm-fixed-price contract shall include initial costs and preparatory expenses allocable to the work done, and profit in a sum determined to be fair and reasonable; this clause also provides that that the cost principles and procedures set forth in FAR part 31 shall govern. FAR 31.102 provides that notwithstanding the mandatory use of cost principles, the objective in a firm-fixed-price contract is to negotiate prices that are fair and reasonable, cost and other factors considered.

Potomac claims that it incurred $27,000 in initial costs and preparatory expenses to perform the contract (compl. ¶ 5). The government argues that Potomac's costs are unreasonable and that it has not proved the costs incurred (gov't br. at 24-25). The record shows that Potomac stated that it is a small firm and that its employees worked round-the-clock, including weekends to meet the contract's tight deadline (finding 11). Potomac also stated that it did not keep track of the hours expended on the contract, as this was a firm-fixed-price, not a cost-reimbursable contract, and its employees receive fixed salaries which were reflected in the spreadsheets it submitted (finding 21). We find Potomac's assertions credible. Potomac also states that DCMA had approved the overhead and G&A rates (finding 21), and the government does not contest that assertion. Potomac's rates were included in Potomac's proposal, which the government found fair and reasonable (finding 9). The Board has no reason to contest this finding by the government. The Board finds that the costs Potomac incurred in initiating contract performance were reasonable and believable. Potomac is entitled to $27,000 incurred in performing the contract until it was terminated on August 29, 2017, plus $2,160 in profit at the rate of 8% for a total recovery of $29,160. Potomac also asserts $3,400 for attorney fees incurred in the context of filing a protest. These costs were not incurred in connection with the performance of the contract, and are denied.

## CONCLUSION

The appeal is sustained. Potomac is entitled to recover $29,160.00 plus interest pursuant to 41 U.S.C. § 7109, from October 2, 2017, to date of payment.

Dated: July 30, 2019

LIS B. YOUNG
Administrative Judge
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 61971, Appeal of Potomac Electric Corporation, rendered in conformance with the Board's Charter.

Dated:

PAULLA GATES-LEWIS
Recorder, Armed Services Board of
Contract Appeals

12